MCI, et al., Plaintiff,

v.

BELL–ATLANTIC, et al., Defendant.

No. CIV. 97–3076(TFH).

United States District Court, District of Columbia.

Feb. 17, 1999.

Donald B. Verilli, Jr., Jenner & Block, Washington, DC, for plaintiff.

Natalie O. Ludaway, Leftwich & Douglas, Washington, DC, for Bell Atlantic, defendant.

Richard A. Beverly, Deputy General Counsel, Public Service Com'n of District of Columbia, Washington, DC, for PSC and Members of Com'n, defendant.

Theodore C. Hirt, U.S. Dept. of Justice, Washington, DC, for FCC, defendant.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

MCI Telecommunications Corp. and MCIMetro Access Transmission Services, Inc. ("MCI") have brought this action pursuant to the Telecommunications Act of 1996 ("the Act"), 47 U.S.C. § 252(e)(6) (1994 ed., Supp. II), for judicial review of a network interconnection agreement approved by the Public Service Commission of the District of Columbia ("the Commission") concerning interconnection between MCI and Bell–Atlan-

tic–Washington, D.C., Inc. ("BA–DC"). The defendants are BA–DC and the Commission. All parties have moved for summary judgment. In addition, the Federal Communications Commission ("FCC") has filed a brief *amicus curiae.*

On October 23, 1998, the Court heard oral argument on the parties' cross-motions for summary judgment. The Court has fully considered those arguments and the written submissions of counsel. Because there is no genuine issue of material fact for trial, the case will be decided as a matter of law pursuant to Federal Rule of Civil Procedure 56.

### I.

The Telecommunications Act of 1996 was designed "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening telecommunications markets to competition..." S. Conf. Rep. No. 104–230, 104th Cong., 2d Sess. 113 (1996) (Joint Explanatory Statement of the Committee of Conference). Through the Act, Congress sought to end monopoly power in the telecommunications industry by dismantling state and local barriers to competition. *See AT&T v. Iowa Utilities Bd.,* —— U.S. ——, 119 S.Ct. 721, 723, —— L.Ed.2d —— (1999).

In furtherance of the statutory goal, the Act provides that entrants into a local telecommunications market may demand three services from an incumbent local exchange carrier ("ILEC"). First, entrants may obtain interconnection with an ILEC's existing local network. *See* 47 U.S.C. § 251(c)(2). Second, new entrants may lease from incumbents individual "network elements," such as routers and switches, at cost. *See id.* § 251(c)(3). Finally, new entrants may purchase at wholesale rights to the services that

the ILEC offers to its customers at retail. *See id.* § 251(c)(4). These services are designed to enable market entrants to enter the market in a practicable manner. As the FCC states in its *amicus* brief, "without rights of access to the existing network, a potential competitor could not gradually enter the market through partial duplication of local telephone facilities: an upstart carrier would win few customers if its customers could call only one another and not customers on the ILEC's separate and completed network." FCC Amicus Brief at 5; *see also United States v. Western Elec. Co.,* 673 F.Supp. 525, 538 (D.D.C.1987) ("duplication of the ubiquitous local exchange network[ ] would require an enormous and prohibitive capital investment.").

Pursuant to § 252 of the Act, ILECs (such as BA–DC) and market entrants such as MCI may enter into voluntarily negotiated agreements for interconnection, unbundled elements and the resale of services, and may petition the pertinent state commission for arbitration to resolve any issues on which the parties cannot agree. *Id.* § 252(a)(1). The Act further provides that all agreements, whether negotiated or arbitrated or both, must be submitted to the appropriate state commission for approval.[1] *Id.* § 252(e). Any party aggrieved by a determination of a state commission "may bring an action in an appropriate Federal district court to determine whether the agreement" satisfies the requirements of §§ 251 and 252 of the Act. *Id.* § 252(a)(6). Finally, to ensure that uniform federal standards were in place before § 252's negotiation and arbitration processes commenced, Congress directed the FCC "to establish regulations to implement the requirements" of § 251 within six months of the passage of the 1996 Act. *Id.* § 251(d)(1). Pursuant to this provision, the FCC issued two orders, *In re Implementation of the Local Competition Provisions of the Telecommunications Act of 1996,* First Report

---

1. Section 252(e) mandates a state-by-state review of any agreement negotiated under the Act. *See* 47 U.S.C. § 252(e). Thus, in potentially all 50 states, a public utility commission will examine the Act and determine the rights and responsibilities of the incumbent local exchange carriers and new market entrants. One questions the

efficacy of this scheme of judicial review, given that the technological evidence will be substantially the same if not identical in all 50 jurisdictions. Allowing the FCC to establish a uniform interpretation of the Act may have been a more effective—and less litigious—system of review.

and Order, 11 F.C.C.R. 15499 (1996) ("First Report and Order") and *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* Second Report and Order, 11 F.C.C.R. 19392 (1996) ("Second Report and Order"). Sections of the *First Report and Order* must be examined in light of the recent Supreme Court decision in *AT & T v. Iowa Utilities Board,* —— U.S. ——, 119 S.Ct. 721, 142 L.Ed.2d 835, in which the Court invalidated the FCC's interpretation of several statutory terms relevant to this litigation.[2]

## II.

MCI and BA–DC engaged in voluntary negotiations under the Act, and on August 30, 1996, when they .could not resolve all outstanding issues, MCI filed with the Commission a petition for arbitration pursuant to § 252 of the Act. The Arbitrator issued his decision in two orders in December 1996.[3] Following the arbitration proceeding, BA–DC and MCI entered into an interconnection agreement ("the Agreement") and a joint application for approval of the Agreement. On September 12, 1997, the Commission issued an order of conditional approval, requiring the parties to reform the Agreement in certain respects. *See Formal Case No. 964C—In re the Application of Bell Atlantic—Washington, D.C., Inc. and MCImetro Access Transmission Services, Inc. for Approval of an Interconnection Agreement Under Section 252(e) of the Telecommunications Act of 1996,* Order No. 11062 (Sept. 12, 1997) ("Commission Order"). The parties reformed the Agreement and refiled it with the Commission. Each party also sought reconsideration of the Commission's decision

to approve the agreement with respect to certain arbitrated terms included therein. On December 12, 1997, the Commission approved the reformed Agreement and denied the parties' request for reconsideration. *See Formal Case No. 964C—In re the Application Bell Atlantic—Washington, D.C., Inc. for Approval of Interconnection Agreement Under Section 252(e) of the Telecommunications Act of 1996,* Order No. 11115 (Dec. 12, 1997) ("Reconsideration Order 11115").

In this appeal, MCI challenges the Commission's decision approving the Agreement with respect to (1) access to "dark fiber," (2) access to one component of BA–DC's "local loop," (3) access to BA–DC's directory assistance database, and (4) the alleged absence within the Agreement of performance measures, performance standards, reporting, and noncompliance mechanisms. BA–DC has filed a counterclaim/crossclaim in which it challenges the Commission's decision to allow MCI to use collocated remote switching modules (RSMs) to perform limited switching functions. The Commission has filed a Motion for Summary Judgment asking this Court to uphold the Agreement in all respects. These claims are considered in turn.

## III.

### A. Standard of Review

 Under the law of this Circuit, a state agency's interpretation of a federal statute is subject to *de novo* review. *James Madison Ltd. v. Ludwig,* 82 F.3d 1085, 1096 (D.C.Cir.1996). "A state agency's interpretation of federal statutes is not entitled to the deference afforded a federal agency's interpretation of its own statutes under *Chevron U.S.A., Inc. v. Natural Resources De-*

---

**2.** The *Iowa Utilities* decision was handed down January 25, 1999, several months after the Court heard oral argument in this case. Although neither party requested supplemental briefing, this Court is bound to consider the impact of *Iowa Utilities* in the instant case. *See DSC Communications Corp. v. Next Level Communications,* 107 F.3d 322, 326 n.2 (5th Cir.1997) ("We are unwilling to ignore [an] important clarification of the law, and perpetuate incorrect law, merely because [the intervening case] was decided after oral argument and briefing in this case.").

**3.** *Telecommunications Arbitration Case 1—In re AT & T Communications of Washington, D.C., Inc. Petition for Arbitration Pursuant to § 252(b) of the Telecommunications Act of 1996 to Establish an Interconnection Agreement with Bell Atlantic,* Order No. 7, Arbitration Decision (Dec. 2, 1996) ("Arbitration Order No. 7"); and *Telecommunications Case 4—In re MCI Telecommunications Corp. For Arbitration of the Unresolved Issues with Bell Atlantic—Washington D.C., Inc. Pursuant to § 252 of the Telecommunications Act of 1996,* Order No. 8, Arbitration Decision (Dec. 26, 1996) ("Arbitration Order No. 8").

*fense Council Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." *Orthopaedic Hosp. v. Belshe,* 103 F.3d 1491, 1495 (9th Cir.1997). By contrast, with respect to findings of fact the Court applies the Administrative Procedure Act's "arbitrary and capricious" standard. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 417, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Under that standard, substantial deference is afforded to the Commission's factual determinations.

## B. MCI's Claims

Under § 251(c)(3) of the Act, an ILEC has an obligation to provide "unbundled access" to certain components of its network. The section states that an ILEC has

> [t]he duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis ... An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunication service.

47 U.S.C. § 251(c)(3). In this context, unbundling is the procedure by which the components of an ILEC's facilities and provision of services are broken down into their individual parts. Thus, to "unbundle" a network element is simply to set a separate price for that element and allow a purchaser such as MCI the ability to lease it separately.

Under § 251(c)(3), an ILEC need provide only those items that qualify as "network elements." *Id.* The Act defines a network element as:

> a facility or equipment used in the provision of a telecommunications service. Such term also includes features, functions, and capabilities that are provided by means of such facility or equipment, including subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in

the transmission, routing or other provision of a telecommunications service.

47 U.S.C. § 153(29).

The determination that a facility or equipment qualifies as a network element does not end the inquiry as to whether it must be provided on an unbundled basis. Under § 251(d), the FCC is instructed to consider whether access to such network elements is "necessary," and whether "the failure to provide access would impair the ability of the telecommunications carrier ... to provide the services that it seeks to offer." *Id.* § 251(d)(2). The statute also directs the FCC to order access to network elements only at "technically feasible points." *Id.* § 251(c)(3). FCC regulations delegate the network element inquiry to the state commissions. *See* 47 C.F.R. § 51.317 (1997).

### 1. Dark Fiber

In the proceeding below, the Arbitrator held that BA–DC is not obligated to supply MCI with access to its "dark fiber" on an unbundled basis. *See Arbitration Order No. 7* at 22. The Commission upheld the Arbitrator's decision in its September 1997 Order. *See Commission Order* at 10. By way of explanation, dark fiber is generally understood to be fiber optic transmission cables that have been installed for future use, but are not currently operational. Its non-operational status is what makes the fiber "dark" (as opposed to operational cables, which are called "lit fiber"). The Arbitrator's determination that dark fiber is not a network element was based on an interpretation of the word "used" in § 153(29) of the Act. *See Arbitration Order No. 7* at 22. The Arbitrator interpreted the word "used" to mean "currently used," as opposed to "will someday be used." *Id.* Because dark fiber is not *currently used* in the provision of telecommunications service, the Arbitrator found, it is not a network element that must be supplied on an unbundled basis. *Id.*

MCI argues that equipment "used" in the provision of telecommunications services should include both equipment "currently in use" and equipment "capable of being used," such as dark fiber. MCI relies on *MCI Telecomm. Corp. v. BellSouth Telecomm.,*

*Inc.,* 7 F.Supp.2d 674, 682 (E.D.N.C.1998). In that case, the District Court for the Eastern District of North Carolina reversed the finding of its State Commission that dark fiber did not fit within the definition of a network element. *See id.* at 682 ("Upon review of a full record, dark fiber falls clearly within the definition of a network element."). In reversing, the court rejected the defendant's argument (which BA–DC offers again in this proceeding) that dark fiber is mere "inventory" and not a part of its network. The court stated:

> This court agrees with MCI that dark fiber is completely different from the rolls of copper wire and stacks of switches alluded to by BellSouth, because dark fiber is already in the ground. It is thus more a part of the network than it is inventory. In some cases, according to the parties' statements at oral argument, it is wound around "lit" fiber inside the same sheathing.

*Id.* at 682. The court went on to remand the dark fiber issue to the North Carolina commission for a determination of whether or not a failure to give access to dark fiber would impair MCI's ability to provide telecommunications services within the meaning of § 251(d)(2). *Id.* at 682.

■ The Court finds no reason to challenge the *MCI v. BellSouth* holding. The plain language of § 153(29) is susceptible to either interpretation, *see also MCI Telecomm. Corp. v. Bell Atlantic–Virginia, Inc.,* No. 3:97cv0629, slip op. at 9 (E.D.Va. July 1, 1998), and the North Carolina court properly reasoned that the installment of dark fiber in the ground renders it less like inventory and more like a network element; that is, "a facility or equipment used in the provision of a telecommunications service." 47 U.S.C. § 251(c)(3); *see also U S West Communications, Inc. v. AT&T Communications, Inc.,* 31 F.Supp.2d 839, 853 (D.Or.1998) ("Although dark fiber is not presently being used to

provide telecommunications services, the same argument could be made with regard to switching or other excess capacity. This fiber is not just sitting in a warehouse, but is in the field ready for use once the appropriate electronics are installed on the other end."). Additionally, the Supreme Court recently commented on the "breadth" of § 153(29)'s definition of a network element. *See Iowa Utilities,* — U.S. ——, ——, 119 S.Ct. 721, 734, 142 L.Ed.2d 835. Accordingly, the Court reverses the Commission's finding on this issue, and holds that dark fiber is a network element within the meaning of § 153(29).

■ Under the Act, an ILEC need not provide a network element to a new market entrant unless lack of access to that element "impair[s]" the entrant's ability to provide telecommunications services. *See* § 251(d)(2). According to the FCC's *First Report and Order,* a market entrant is impaired if the failure "to provide access to a network element would decrease the quality, or increase the financial or administrative cost of the service a requesting carrier seeks to offer, compared with providing that service over other unbundled elements in the incumbent LEC's network." *First Report and Order* ¶ 285. The Commission applied the FCC's interpretation in upholding the Arbitrator's ruling denying MCI access to BA–DC's dark fiber. *See Reconsideration Order* 11115 at 11. Since the time of the Commission's ruling, however, the Supreme Court has struck down the FCC's interpretation of "impairment."[4] *See Iowa Utilities,* — U.S. ——, ——, 119 S.Ct. 721, 734, 142 L.Ed.2d 835. The Court stated:

> [T]he Commission's assumption that any increase in cost (or decrease in quality) imposed by denial of a network element renders access to that element 'necessary,' and causes the failure to provide that element to 'impair' the entrant's ability to

---

4. The effect of the Court's holding was to vacate 47 C.F.R. § 51.319, in which the FCC set out the specific unbundling requirements imposed on the ILECs. The reasoning of the opinion, however, was that the FCC employed a flawed methodology in formulating this regulation. *See Iowa Utilities,* — U.S. ——, ——, 119 S.Ct. 721, 734, 142

L.Ed.2d 835. That same methodology was employed in formulating 47 C.F.R. § 51.317, which instructs the state commissions on how to craft their own unbundling requirements. Thus, although the Court did not reach the validity of § 51.317, the *Iowa Utilities* holding is equally applicable to that regulation.

furnish its desired services is simply not in accord with the plain and ordinary meaning of those terms. An entrant whose anticipated annual profits from the proposed service are reduced from 100% of investment to 99% of investment has perhaps been 'impaired' in its ability to amass earnings, but has not *ipso facto* been 'impair[ed] ... in its ability to provide the services it seeks to offer';...

*Id.* The Court noted that "[the Act] requires the [Federal Communications] Commission to determine on a rational basis which network elements must be made available, taking into account the objectives of the Act and giving some substance to the 'necessary' and 'impair' requirements. The latter is not achieved by disregarding entirely the availability of elements outside the network, and by regarding any 'increased cost or decreased service quality' as establishing a 'necessity' and an 'impair[ment]' of the ability to 'provide ... services.'" *Id.* at 734. Thus, the Court rejected the FCC's interpretation of impairment in favor of a more rigorous standard. Although the Court left the definition of that new standard for future proceedings, it is clear that a market entrant must demonstrate something more than a minor decrease in quality or rise in costs. *Id.*

Even under the relaxed pre-*Iowa Utilities* standard crafted by the FCC, the Commission found that MCI had not demonstrated that it would be impaired without access to dark fiber. *See Reconsideration Order 11115* at 11. The Commission stated:

Although MCI has asserted that it would incur significant construction costs to install its own fiber unless unbundled access to BA–DC's dark fiber is provided, this general assertion does not demonstrate that the cost of providing the service will increase as compared with providing that service through use of unbundled elements. Further, MCI did not describe any planned service that it would be unable to provide without access to dark fiber.

*Id.* The only rebuttal evidence submitted by MCI that demonstrates impairment is from a report on MCI authored by D. Agatston titled "Network Implementation: Require-

ments for Interconnection, Access to Unbundled Elements, and Collocation" ("Agatston Report"). The Agatston Report states:

. Without [dark fiber], MCI's only choices are to undertake the timely and expensive construction effort to place its own fiber in the ground or to purchase the use of "lit" (fiber with electronics) transport services from the ILEC: It does not make sense to require MCI to purchase the use of ILEC electronics where spare fiber capacity is available; in fact, using the ILEC's existing electronic technology forces MCI to be held captive to the ILEC's network technology and design rather than being allowed to deploy new, more efficient technologies that are consistent across geographic locations.

Agatston Report at 31. MCI's impairment argument is based exclusively on the above passage from the Agatston Report and speculation over increased costs. MCI did not submit any evidence to the Commission that demonstrates that MCI will indeed have higher costs or that it will suffer other losses if it does not have access to BA–DC's dark fiber. Furthermore, MCI did not submit estimates of what its costs would be were it to provide the same service over other elements of BA–DC's network, even though the FCC's *First Report and Order* required this kind of information. *See First Report and Order* ¶ 531. Thus, given the record before it, and particularly in light of the Supreme Court's intervening decision in *Iowa Utilities*, the Commission did not err in its impairment determination. *Cf. MCI v. Bell Atlantic–Virginia*, slip op. at 10 ("While [a lack of access to dark fiber] may inconvenience MCI, it does not rise to the level of impairing its ability to provide local communications service."). As a result, the Court will uphold the Commission's ruling and DENY MCI's Motion for Summary Judgment with respect to this issue.

**2. Loop Distribution**

MCI's next claim is that it is entitled to unbundled access to the "loop distribution" element of BA–DC's "local loop." Loop distribution is a constituent element of the local loop, which is the piece of the network that connects a customer's premises to the near-

est switch. The local loop can be subdivided into its component "sub-loop" parts: loop distribution, loop concentrator/multiplexor, and loop feeder. The loop distribution component is the line from a customer's premises to the device that gathers several of those lines together, such as the feeder distribution interface ("FDI") or a loop concentrator/multiplexor. At the FDI, the loop distribution lines from customers' premises are gathered or "concentrated" into a smaller number of "loop feeder" lines that carry traffic from that point to the local switch. A competitor such as MCI with some equipment in place does not require loop access to the entire loop; instead, it can connect its own facilities directly to loop distribution, thereby bypassing the other portions of the loop.

The Commission determined that subloop unbundling is not technically feasible and therefore not required under 47 U.S.C. § 251(c)(3). *See Reconsideration Order 11115* at 9 (upholding arbitration decision). As noted above, an ILEC's duty to provide access to network elements exists only at "technically feasible point[s]." *Id.* § 251(c)(3). The Commission found that BA–DC had satisfactorily established that there were unresolved issues related to the technical feasibility of subloop unbundling, and that access to loop distribution should therefore be denied. *See Reconsideration Order 11115* at 10. MCI charges that the Commission improperly relied on the FCC's *First Report and Order.* In that Order, the FCC declined to order loop distribution unbundling, but ordered that the issue should

be resolved at the state level on a case-by-case basis. *Id.* at ¶ 391. MCI claims that the Commission mistakenly relied on the FCC Order for its findings, thereby abdicating its duty to conduct its own inquiry into subloop unbundling.

Contrary to the assertions of MCI, it appears that the Arbitrator did conduct its own inquiry. At the arbitration proceeding, BA–DC submitted the affidavits of Donald Albert, the Network Director of Co–Carrier Implementation, who stated that numerous technical issues[5] were required to be resolved to establish the technical feasibility of sub-loop unbundling. *See Arbitration Order No. 8* at 9. In the absence of any evidence from MCI clarifying the technical issues raised by Albert, the Arbitrator concluded that there was "no resolution to these issues in this record." *Id.*[6] As a consequence, the Arbitrator found that subloop unbundling was not technically feasible within the meaning of § 251(c)(3). *See id.*

■ Under the regulations established by the FCC's *First Report and Order,* the burden of proof on questions of technical feasibility falls on the ILECs. *See First Report and Order* ¶ 198 ("incumbent LECs must prove to the appropriate state commission that a particular interconnection or access point is not technically feasible."); *see also* 47 C.F.R. § 51.5;[7] *MCI v. Bellsouth,* slip op. at 9 ("the court stresses that restrictions on access [to network elements] are presumed to be unreasonable and the burden to justify them falls squarely on the ILEC."). Here, BA–DC demonstrated that there were unre-

---

**5.** The technical issues listed in the Albert Affidavit include network reliability, network security, trouble identification, trouble isolation and testing, and cable sheath spectrum management. *See* Albert Affidavit ¶ 6.

**6.** Several of the state commissions that have found that an ILEC must provide unbundled access to loop distribution have required the use of a bona fide request ("BFR") process for determining how access to subloop elements could be accomplished. MCI's request for unbundled access for loop distribution as presented to the Commission did not include the use of a BFR process. On remand, the Arbitrator is entitled to require the use of such a process in order to examine the technical feasibility of subloop unbundling.

**7.** 47 C.F.R. § 51.5 states in pertinent part:

Technically feasible. Interconnection, access to unbundled network elements, collocation, and other methods of achieving interconnection or access to unbundled network elements at a point in the network shall be deemed technically feasible absent technical or operational concerns that prevent the fulfillment of a request by a telecommunications carrier for such interconnection, access, or methods. * * * An incumbent LEC that claims that it cannot satisfy such request because of the adverse network reliability impacts must prove to the commission by clear and convincing evidence that such interconnection, access, or methods would result in specific and significant adverse network reliability impacts.

solved issues regarding the technical feasibility of subloop unbundling. The Arbitrator did not find that these issues were unresolvable, however, but only that MCI had not submitted evidence sufficiently clarifying the technical issues. Finding for BA–DC on the basis of ambiguous evidence on technical feasibility is inconsistent with the FCC Order placing the burden of demonstrating technical infeasibility on BA–DC. Thus, in respect to the technical feasibility of subloop unbundling, the Court will REMAND this issue to the Commission. The Arbitrator is instructed that the burden of proof at the rearbitration falls on BA–DC with respect to this issue. *See First Report and Order* ¶ 198.

### 3. Directory Assistance Database

█ Under the Act, BA–DC must provide MCI with access to its directory assistance database as an unbundled network element. *See* 47 U.S.C. § 251(c)(3); *id.* § 153(29) (defining "network element" to include "databases"). MCI requested directory assistance data by means of an electronic interface or daily magnetic tape, which would allow MCI to feed BA–DC's data into MCI's own database and provide directory assistance directly to its customers, as BA–DC currently does with its own customers. BA–DC, however, offered only to allow "read-only" access. This means that MCI would not receive a copy of the entire directory in a readily accessible format but, rather, would use BA–DC's directory assistance system. The Commission accepted BA–DC's proposal, concluding that the read-only access offered by BA–DC satisfied the requirements of the Act. *See Commission Order* at 13.

Under 47 U.S.C. § 251(c)(3), access to unbundled network elements must be both "reasonable" and "nondiscriminatory." 47 U.S.C. § 251(c)(3). The FCC *First Report and Order* specifies the nondiscriminatory access that is required:

A LEC must permit competing providers to have access to and read the information in the LEC's directory assistance data-

base. . . . Such access must include both entry of the requesting carrier's customer information into the database, and the *ability to read such a database,* so as to enable requesting carriers to provide operator services and directory assistance concerning incumbent LEC customer information.

*First Report and Order* ¶ 538. Thus, the FCC Order requires only that ILECs provide read-only access to their directory assistance databases. The access requested by MCI goes beyond read-only access and therefore exceeds the access that the FCC required in implementing the nondiscrimination requirement of § 251(c)(3) of the Act. *See Reconsideration Order 10929* at 7.[8]

In addition, the Arbitrator found that "read only" access provides MCI with the same level and quality of service as BA–DC provides to itself. The Arbitrator made the following finding:

BA–DC's proposal follows the FCC regulations and is therefore adopted. BA–DC will provide MCI with the ability to read its directory assistance database through either the Electronic Request service or the Direct Access service, with the same level and quality of access as Bell Atlantic provides to itself.

*Arbitration Order No. 8* at 28. Equal services of this sort are nondiscriminatory on their face and conform to the requirements that the FCC found to be nondiscriminatory in its *First Report and Order.* As a result, the Court will uphold the Commission's determination with respect to this issue.

### 4. Performance Measures and Standards, Reporting and a Noncompliance Mechanism

MCI's final argument on summary judgment is that the Commission failed to impose a "meaningful performance requirement" on BA–DC under the parties' interconnection agreement. Specifically, MCI asked the Commission to require BA–DC to perform certain critical functions within set periods of

---

**8.** *Telecommunications Arbitration Case 4—In the Matter of Petition of MCI Telecommunications Corporation for Arbitration of Unresolved Issues With Bell Atlantic—Washington, D.C., Inc. Pursu-* ant to Section 252 of the Telecommunications Act of 1996. Order No. 10929 (Feb. 26, 1997) ("Reconsideration Order 10929").

time, to measure those intervals and report them, so that MCI can determine whether they are being met, and to incur penalties when those intervals are not met. The Arbitrator refused to impose any performance standards on BA–DC because it found that MCI's position was vague, and that the negotiated provisions of the parties' interconnection agreement already included performance requirements. *See Arbitration Order No. 8* at 39; *Reconsideration Order 11115* at 16.

On the basis of this record, the Court agrees with the decision of the Arbitrator that "MCI's position on these issues is simply too vague and undefined for the Commission to determine the specific provisions that MCI believes should be included within the Agreement." [9] *Id.* Furthermore, the Court notes that the Agreement already includes extensive performance standards, reporting requirements and a dispute resolution provision to enforce compliance with the Agreement. *See Agreement* at §§ 34.1, 34.3, 34.4 and 34.5. Thus, any concerns that MCI raises regarding a lack of standards are mitigated by the standards already in place under the Agreement. As a result, MCI's request for summary judgment on this issue is DENIED.

## C. BA–DC's Claim

### 1. Collocated Remote Switching Function ("RSM")

On appeal, BA–DC challenges the Commission's decision to permit MCI to use a collocated remote switching module to perform limited switching functions. Under the Act, market entrants such as MCI are entitled to "collocate" equipment on an ILEC's premises. *See* 47 U.S.C. § 251(c)(6), Collocation occurs when a market entrant places its

equipment at the ILEC's premises or offices for access to network elements or interconnection with the ILEC's network.

Collocation is governed by the standard set forth in § 251(c)(6) of the Act, which provides that an ILEC has:

> The duty to provide, on rates, terms, and conditions that are just, reasonable and nondiscriminatory, for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier, except that the carrier may provide for virtual collocation if the local exchange carrier demonstrates to the State commission that physical collocation is not practical for technical reasons or because of space limitations.

*Id.* § 251(c)(6). The FCC has interpreted the word "necessary" to mean "used" or "useful," not "indispensable." [10] *See First Report and Order* ¶ 579; *see also MCI Telecomm. Corp. v. U.S. West Communications, Inc.*, 97cv1508R, slip op. at 12 (W.D.Wash. July 21, 1998). The FCC explained that a showing that a new entrant "could use other equipment to perform a similar function" does not demonstrate that the specified equipment is not necessary within the meaning of § 251(c)(6). *First Report and Order* ¶ 579. Thus, when the Act and the FCC Order are read together, physical collocation is permitted whenever the equipment is used for interconnection or access to unbundled network elements.

In contrast to the proceeding below, BA–DC no longer argues that the collocation of RSMs should be prohibited. Instead, BA–DC seeks to limit the use of RSMs once collocated. As found by the Arbitrator, an RSM is a multifunctional piece of equipment

---

9. The Court notes that it was in connection with this argument that the Arbitrator found that "MCI's failure to provide specific support for many of its positions in this proceeding has unnecessarily consumed the Commission's resources and unduly increased the cost of the arbitration case." *Arbitration Order No. 8* at 39.

10. The Court notes that the *Iowa Utilities* decision casts doubt on the validity of the FCC interpretation. *See Iowa Utilities*, 119 S.Ct. at 734 (holding that FCC's interpretation of "necessary" in the related context of § 251(c)(3) was "not in

accord with the ordinary and fair meaning of [that] term[ ]."); *see also U.S. West v. AT & T*, 31 F.Supp.2d at 854 n.9 ("the court's dictionary defines 'necessary' as 'essential' and 'necessaries' as 'items ... that cannot be done without ...' Webster's Third International Dictionary (1981), p. 1510. Apparently, the FCC consulted a different dictionary."). The validity of the FCC interpretation of § 251(c)(6) was not raised before this Court, however, and therefore will not be addressed in this proceeding.

whose functions include (1) interconnection or access to unbundled network elements and (2) switching. *See Arbitration Order No. 7* at 11.[11] BA–DC argues that even limited use of the switching functionality of a collocated RSM is inconsistent with the law because § 251(c)(6) of the Act permits collocated equipment to be used only for interconnection or access.[12]

It is true that the FCC declined to impose a general requirement that switching equipment be collocated on the ground that such equipment may not generally be used for "actual interconnection or access to unbundled network elements." *First Report and Order* ¶ 581. The FCC expressly recognized, however, that "modern technology has tended to blur the line between switching equipment and multiplexing equipment," and that therefore state commissions should have the discretion to determine whether multifunctional equipment should be collocated. *First Report and Order* at ¶ 581. The FCC stated: "[w]e expect, in situations where the functionality of a particular piece of equipment is in dispute, that state commissions will determine whether the equipment at issue is actually used for interconnection or access to unbundled elements." *Id.*

█ It is clear for several reasons that the Commission's decision to permit collocation of the RSM is consistent with the Act and the *First Report and Order.* First, the Arbitrator found that the "primary function" of multifunctional RSMs in this context was interconnection or access, and not switching. *See Arbitration Order No. 7* at 12; *see also Reconsideration Order 10921* at 8. Second, the Interconnection Agreement in this case contains a limitation designed to ensure that collocated RSMs would be used predominately for interconnection and access. The Agreement states as follows:

Bell Atlantic shall provide space, as reasonably requested by MCIm, to meet MCIm's needs for placement and equipment. MCIm may collocate only that equipment which is used for interconnection or access to Network Elements. Remote Switching Equipment, if any is collocated, may be used to provide switching between two (2) unbundled loops connected to the same remote switching module to serve MCIm customers:

*Joint Amendments to the Bell Atlantic–Washington D.C., Inc. and MCImetro Access Transmission Services, Inc. Interconnection Agreement, Formal Case No. 964C.* Filed November 7, 1997 at § 2.1, approved by *Commission Order* at 5. Thus, except in the limited circumstance where MCI has two customers connected to the same RSM, the RSM would operate solely as interconnection/access equipment. This limitation, as well as the language of the statute and the FCC's *First Report and Order,* confirms that the Commission did not commit legal error with respect to the physical collocation of MCI's RSM. Accordingly, BA–DC's motion for summary judgment is DENIED with respect to this issue.

### IV.

The administrative record demonstrates that the Commission performed its statutory duty and that the claims of all parties were subject to thorough review. Based on this Court's independent review of the issues, the Commission's determinations are upheld except on the question of loop distribution. On this question, the Court REMANDS for rearbitration consistent with the burden of proof as allocated in the FCC's *First Report and Order.* Thus, MCI's Motion for Summary Judgment is partially GRANTED and partially DENIED. BA–DC's Motion for Summary Judgment is DENIED. The Com-

11. *Telecommunications Arbitration Case 1—In the Matter of AT & T Communications of Washington, D.C. Inc. Petition for Arbitration Pursuant to Section 252(B) of the Telecommunications Act of 1996,* Order No. 10921(Feb. 3, 1997) ("Reconsideration Order 10921").

12. BA–DC argues that the District Court for the Eastern District of Virginia considered this issue

and held that the collocation of RSMs is prohibited where the RSM might be used for switching purposes. *See MCI v. Bell Atlantic–Virginia,* slip op. at 18–19. In fact, the Virginia court held that a state commission *may* lawfully prohibit switching, and not that a prohibition of switching is *required* under the Act. *Id.*

mission's Motion for Summary Judgment is partially GRANTED and partially DENIED.

An Order consistent with this Memorandum Opinion will issue this same day.

### ORDER

Pending before the Court are Motions for Summary Judgment filed on behalf of parties MCI Telecommunications Corp. and MCIMetro Access Transmission Services, Inc. ("MCI"), the Public Service Commission of the District of Columbia ("the Commission"), and Bell–Atlantic–Washington, D.C., Inc. ("Bell Atlantic"). For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that MCI's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part; it is further

**ORDERED** that the Commission's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part; it is further

**ORDERED** that Bell Atlantic's Motion for Summary Judgment is **DENIED**; it is further

**ORDERED** that this matter is **REMANDED** to the Commission for further proceedings, consistent with the Memorandum Opinion, on the following issue:

Whether subloop unbundling is "technically feasible" and therefore required under 47 U.S.C. § 251(c)(3).