**MCI TELECOMMUNICATIONS CORP. and MCImetro Access Transmission Services, Inc., Plaintiffs,**

v.

**MICHIGAN BELL TELEPHONE COMPANY d/b/a Ameritech Michigan, Inc., et al., Defendants.**

No. 97–74362.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 29, 1999.

Opinion Granting in Part Motion to Amend and Denying Reconsideration Dec. 22, 1999.

Robert J. Franzinger, Dykema Gossett, Detroit, MI, Albert Ernst, Dykema Gossett, Lansing, MI, for MCI Telecommunications Corporation, MCImetro Access Transmission.

Theodore C. Hirt, U.S. Department of Justice, Civil Division, Washington, DC, for United States of America, Federal Communications Commission.

Michael G. Vartanian, Jeffery V. Stuckey, John M. Dempsey, Dickinson, Wright, Lansing, MI, Bruce R. Byrd, Dickinson, Wright, Detroit, MI, Michael A. Holmes, Ameritech, Detroit, MI, for Michigan Bell Telephone Company.

Don L. Keskey, David A. Voges, Sharon Feldman, Michigan Department of Attorney General, Public Service Division, Lansing, MI, for Michigan Public Service Commission, John G. Strand, John C. Shea, David A. Svanda.

EDMUNDS, District Judge.

## OPINION AND ORDER AFFIRMING IN PART AND REVERSING IN PART DECISIONS BY THE MICHIGAN PUBLIC SERVICE COMMISSION

This case came before the Court at a hearing on September 8, 1999, on the parties' cross appeals of rulings by the Michigan Public Service Commission (MPSC). The parties claim that the Interconnection Agreement between them, as arbitrated and approved by the MPSC, is inconsistent with the Telecommunications Act of 1996 and the FCC's implementing regulations.

As explained below, the decisions of the MPSC are AFFIRMED in part and REVERSED in part.

### I. Facts

Plaintiffs, MCI Telecommunications Corporation and MCImetro Access Transmission Services, Inc. (collectively "MCI") and Michigan Bell Telephone Company d/b/a Ameritech Michigan, Inc ("Ameritech") have appealed MPSC Case No. U–11168, each claiming that certain terms of their Interconnection Agreement violate the Telecommunications Act of 1996.[1]

Historically, local phone service was provided by a monopoly and was regulated by the states. States usually gave an exclusive franchise to one carrier, which owned the entire local exchange network, including local loops (the cables that connect telephones to switches), the switches (computers that direct calls to their destination), and transport facilities (equipment that directs calls between switches). In 1996, Congress sought to end monopolization of local phone service by enacting the Telecommunications Act, which fundamentally restructures local telecommunications markets. The purpose of the Act is to shift monopoly local telephone markets to competition as quickly as possible. H. Rep. No. 104–204, at 89 (1995), *reprinted in* 1996 U.S.C.C.A.N. 10 (JA 44).[2]

---

1. The Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996) is codified in scattered sections of the United States Code, Title 47.

2. References to "JA" are references to the parties' six volume joint appendix.

In essence, the Act requires an incumbent local exchange carrier (ILEC), like Ameritech, to share its network with competing local exchange carriers (CLEC's). Under section 251, the Act imposes substantive requirements on incumbents and under section 252, the Act sets forth a procedure for implementing those requirements in an interconnection agreement.[3] Section 251 provides that a requesting carrier can obtain access to the incumbent's network in three ways: 1) it can interconnect its facilities with the incumbent's facilities; 2) it can purchase the incumbent's services at wholesale prices and resell the services to customers; or 3) it can lease elements of the incumbent's network on an "unbundled basis." 47 U.S.C. § 251. In each case, the incumbent must charge rates that are just, reasonable, and nondiscriminatory. *Id.* Under section 252 of the Act, incumbent local exchange carriers are required to negotiate in good faith over the terms of interconnection, resale, and access to network elements, and to enter into interconnection agreements with competitors. *Id.* §§ 251(c)(1) & 252(a)(1). When the parties cannot arrive at a complete agreement through negotiations, the parties are subject to compulsory arbitration via administrative proceedings before the local public service commission. *Id.* § 252(b) & 252(e)(5). The state commissions must apply the substantive federal requirements set forth in section 251 and the FCC's implementing regulations. 47 U.S.C. § 252(c)(1). After the proposed interconnection agreement is finally negotiated and/or arbitrated, it is submitted to the state public service commission for final approval. *Id.* § 252(e)(1). The parties then may bring suit in federal district court challenging the terms of the final agreement on the ground that the terms are inconsistent with the Act or with the FCC regulations. 47 U.S.C. § 252(e)(6).[4] This suit falls under section 252(e)(6).

In this case, MCI and Ameritech entered into an Interconnection Agreement. The parties negotiated and then arbitrated certain disputed issues before an Arbitration Panel. Arbitration Decision (JA 17). Both parties objected to the Arbitration Decision, and on December 20, 1996, the MPSC issued an order resolving the objections and approving the Agreement. First Approval Order (JA 20). In this First Approval Order, the Commission ordered the parties to file a completed agreement within ten days. The parties disputed additional issues, including Ameritech's proposed limitation of liability provisions. The Commission ordered MCI to accept Ameritech's proposed limitation of liability provisions. Commission Order, June 5, 1997 (JA 27) Then, the Commission again approved the Agreement. Commission Order, July 31, 1997 (JA 28).

MCI and Ameritech challenge certain terms of their Interconnection Agreement in this consolidated lawsuit.[5] Ameritech in its Complaint alleges that the Agreement, as approved by the Commission in its various orders, violates the Act as follows:

1. The Agreement includes performance benchmarks and penalties proposed by MCI (Ameritech's Complaint Counts I–IX);

2. The Agreement provides a two-hour conversion window and a five minute conversion interval for cutover of unbun-

---

3. The Act also preempts state laws and regulations that impede competition. 47 U.S.C. § 253(c); *AT & T v. Iowa Utilities Board,* 525 U.S. 366, 119 S.Ct. 721, 726, 142 L.Ed.2d 835 (1999).

4. Section 252(e)(6) provides:
 In any case in which a State commission makes a determination under this section [252], any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement ... meets the requirements of section 251 of this title and this section [252].

5. Ameritech's Complaint also named Michigan Public Service Commissioners John Strand, John Shea, and David Svanda as defendants in this case. The MPSC did not file a brief nor did it participate in oral argument on this matter.

dled loops (Ameritech's Complaint Count XIII);

3. The Agreement imposes unreasonable time periods for the bona fide request process (Ameritech Complaint Count XI).

4. The Agreement improperly defines "rights-of-way" (Ameritech's Complaint Count XII); and

5. The Agreement requires Ameritech to offer dark fiber as an unbundled network element (Ameritech's Complaint Count X);

MCI's Amended Complaint alleges that the Agreement violates the Act as follows: [6]

1. The Agreement fails to require Ameritech to provide immediate and nondiscriminatory unbundled access to loop distribution (Count III);

2. The Agreement imposes non-cost-based prices for local switching when it is purchased in conjunction with common transport (Count VI);

3. The Agreement fails to require Ameritech to pay MCI the tandem interconnection rate as compensation for the transport and termination of local telecommunications traffic (Count I);

4. The Agreement fails to require Ameritech to provide MCI with access to Ameritech's yellow pages (Count IV); and

5. The Agreement improperly limits Ameritech's liability for misconduct (Count II).

## II. Standard of Review

■ In reviewing a 252(e)(6) action, district courts must review questions of law *de novo*, and issues of fact under an arbitrary and capricious standard. *U.S. West Communications, Inc. v. Hix*, 986 F.Supp. 13, 19 (D.Colo.1997). The arbitrary and capricious standard requires that a district court give deference to the state commission's decisions; the agency's

action will be presumed valid if a reasonable basis exists for its decision. *Id.* at 18. This court should not "sit as a surrogate public utilities commission to second-guess the decisions made by the state agency to which Congress has committed primary responsibility for implementing the Act." *U.S. West Communications, Inc. v. Jennings*, 46 F.Supp.2d 1004, 1008 (D.Ariz. 1999) (Supplemental Authority, June 22, 1999, Ex. 4).

■ In determining whether a decision is arbitrary and capricious, a court must consider whether the decision was based on the relevant factors and whether there was a clear error of judgment. *Hix*, 986 F.Supp. at 18.

> Generally, an agency decision will be considered arbitrary and capricious if the agency had relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The Court is not empowered to substitute its judgment for that of the agency.

*Id.* (citing *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir.1997) (citations omitted)). A court can uphold the state commission's decision only on the grounds set forth in the decision. *MCI Telecomm. Corp. v. Bell Atlantic–Virginia, Inc.*, No. 3:97CV629, 1988 U.S. Dist. LEXIS 17558, at *17 (E.D.Va. July 1, 1998) (JA 56).

To apply this standard of review, a court must examine the Commission's decision and the record underlying the decisions. The Commission's decision is inextricably intertwined with the Interconnection Agreement because the Commission's decisions resulted in certain provisions of the

---

**6.** Note that MCI has elected not to pursue its claim under Count V of the Amended Complaint, which alleged that the Agreement improperly priced common transport. MCI in-

dicated it plans to move to voluntarily dismiss Count V, without prejudice. MCI Brief, p.2 n. 3.

Agreement. *GTE South Inc. v. Morrison,* 957 F.Supp. 800, 804 (E.D.Va.1997).

## III. Analysis

### A. Benchmarks and Penalties

Ameritech appeals the MPSC decision adopting certain performance benchmarks and penalties, which were proposed by MCI and incorporated into the Agreement by the MPSC. The performance benchmarks limit the time within which Ameritech must fill MCI orders for interconnection, access to network elements, and wholesale services. The penalties require Ameritech to pay "delay credits," "performance failure credits," and "subscriber usage credits" to MCI when Ameritech fails to meet the performance benchmarks. For example, with regard to subscriber-specific services, if Ameritech does not fill an order for network elements within the allotted time, Ameritech must waive the provisioning fee and must pay MCI a delay credit equal to the monthly charge for the service. With regard to non-subscriber specific services (i.e. services for multiple customers), the delay credit is equal to $25,000 per day. Agreement, Sch. 3.8.10–3 (JA 1).

### 1. MPSC Had Jurisdiction to Adopt Benchmarks and Penalties

■ Ameritech first claims that the MPSC lacked jurisdiction to impose MCI's proposed benchmarks and penalties because they were not raised in the petition or the response. MCI proposed specific benchmarks and penalties for the first time one week before the arbitration hearing. The Act provides that the State commission shall limit its consideration to the issues set forth in the petition and the response. 47 U.S.C. § 252(b)(4)(A).

Ameritech's claim that the issue of benchmarks and penalties was not sufficiently raised and was not raised soon enough is disingenuous. While MCI's Petition for Arbitration did not include specific proposed performance benchmarks and penalties, it did raise the issue of quality of service. MCI's Petition at 7–8

(JA 2); *see also* MCI's "white papers" filed in support of the Petition, Operation Support Systems and Quality of Service Implementation Requirements at 1 (JA 5). Ameritech's Response included Ameritech's proposed standards, benchmarks, and procedures to ensure quality of service. Response at 6 (JA 7). The MPSC appointed an Arbitration Panel and the Panel ordered the parties to file a joint status report designating the issues for arbitration. Issues 31 and 34 in the status report identified the issues of service parity and target installation intervals, i.e. benchmarks. Status Report at 47–48 & 52–53.

On October 16, 1996, MCI filed its proposed arbitration decision, which set forth the specific benchmarks and penalties which were ultimately adopted by the arbitrators and the Commission. MCI PDAP at 15–16 (JA 9). Ameritech filed its proposed arbitration decision which included its own performance measures. The arbitration hearing was held on October 24 and 25. The parties presented testimony directed to their competing performance standard proposals. Thus, the issue of performance benchmarks and penalties was raised before the Arbitration Panel and the parties had the opportunity to be heard on this issue. The MPSC, therefore, had jurisdiction and authority to decide the issue.

### 2. MPSC's Adoption of Benchmarks and Penalties was not Arbitrary and Capricious

■ Ameritech contends that the MPSC's adoption of the benchmarks and penalties was arbitrary and capricious because it was not based on evidence in the record showing that the benchmarks and penalties promote non-discrimination or "parity." The Act prohibits discrimination in a number of ways. It requires that incumbents provide interconnection that is at least equal in quality to that provided by the local exchange carrier to itself or others and on rates, terms, and conditions that are nondiscriminatory. 47 U.S.C. § 251(c)(2). An incumbent also must pro-

vide nondiscriminatory access to network elements, *Id.* § 251(c)(3), and must provide services at wholesale prices without imposing discriminatory conditions. *Id.* § 251(c)(4)(B).

Ameritech contends that the essence of nondiscrimination is a comparison of what Ameritech provides to itself and others to what Ameritech provides to MCI. Ameritech complains that MCI's benchmarks are unreasonable because they are not based on such a comparison. Ameritech reasons that the MPSC decision was arbitrary because it failed to cite specific evidence supporting the adoption of MCI's benchmarks and penalties.

The Arbitration Panel adopted MCI's proposal regarding benchmarks and penalties instead of Ameritech's proposal. Arbitration Decision at 43–45 (JA 17). The arbitration procedures provided that issues would be resolved through "final offer" or "baseball" arbitration. Under that process, prior to the arbitration hearing, the parties submitted their final, best offers on the disputed issues. The Panel was to select one of those offers, except when the "results would be clearly unreasonable or contrary to the public interest." Arbitration Decision at 6 (JA 17).

In adopting MCI's proposed benchmarks and penalties, the Panel explained that MCI's proposal would ensure service parity and that Ameritech's proposal lacked the necessary details for enforcement of such parity.

The Panel was given the choice of two sets of contract language to verify compliance [with the Act's parity requirements]. MCI's performance measurements are intended to provide the parity required. While Ameritech claims that with regard to installation and provisioning it will provide MCI Metro with "service parity," Ameritech's proposal is devoid of details of how such claims will be verified or enforced.

*Id.* at 44. The Panel goes on to note that timely provision is critical to enable MCI to compete and that it is reasonable to expect Ameritech to install items for MCI in the same time within which it would install the items for itself. *Id.* The MPSC adopted the decision of the Arbitration Panel. First Approval Order at 2–3 (JA 20).

The essence of Ameritech's argument is that the Panel did not make factual findings regarding the basis for the proposed benchmarks and penalties, nor did it offer a sufficient explanation for its decision. Applying the arbitrary and capricious standard, the Court finds that there was a reasonable basis for the Arbitration Panel's decision. The Panel explained that service parity and enforcement of service parity are essential under the Act. MCI's proposed benchmarks and penalties provide the parity required, and Ameritech's proposal lacked the necessary details to effectively verify or enforce parity. There was no clear error of judgment.

MCI's proposal was supported by the testimony of Carl Geisy. He stated that MCI had been able to determine, based on its limited experience with resale and interconnection, that interconnection trunks should be set up within ten days and that unbundled loops should be established within two days where there are already facilities present. Tr. of Oct. 24, 1996 Hearing at 98–99 & 1010 (JA 14).[7]

---

7. Ameritech also contends that the Commission's decision was arbitrary because it did not explain why its decision deviated from its decision in the Ameritech/AT & T arbitration and from the decisions by other State commissions which rejected MCI's benchmarks and penalties. This Court has previously held that extra record evidence is not admissible in this proceeding, absent extraordinary circumstances. Tr. Nov. 10, 1998 Hearing at 10. Thus, the Court will not review the records in other cases. However, the Court may look to decisions of other panels and other state commissions as persuasive precedent to the extent that the decisions deal with similar facts and circumstances. The state commissions in Illinois, Ohio, and Wisconsin all rejected MCI's proposed benchmarks because MCI failed to bring forth evidence showing that its benchmarks were reasonable. *MCI's Arbitration with Illinois Bell,* No. 96 AB–006 at 62 (Arbitration Decision Dec. 17, 1996) (JA 84) ("support for MCI's benchmarks is unclear");

### 3. Benchmarks and Penalties Did Not Violate the Act

 Ameritech further argues that the benchmarks and penalties violate the nondiscrimination provisions of the Act because they require Ameritech to provide "superior" service to MCI. Ameritech does not have standing to bring a claim of discrimination under the Act on behalf of other competitors. *MCI Telecomm. Corp. v. Pacific Bell,* No. C97–0670SI, 1998 U.S. Dist. Lexis 17556, at *105 (N.D.Calif.Sept. 29, 1998) (JA 57). Moreover, the Act's nondiscrimination provisions are aimed at preventing incumbents like Ameritech from discriminating in their own favor. The Act does not require that all interconnection agreements be identical. *Id.* Furthermore, the benchmarks and penalties do not violate the Act; they are helpful in implementing the nondiscrimination provisions of the Act.[8] Benchmarks and penalties verify and enforce quality of service and nondiscrimination.[9]

### 4. Penalties Are Reasonable and Enforceable

 Finally, Ameritech contends that the penalties adopted by the Commission are not enforceable because they are unreasonable and punitive. Under Michigan law, liquidated damages are enforceable only if they are reasonable and not punitive, because the purpose of damages for breach of contract is to compensate, not to punish. *Curran v. Williams,* 352 Mich. 278, 89 N.W.2d 602, 604 (1958). The issue of whether liquidated damages are reasonable is a question of law for the court. *In re Constr. Diversification, Inc.,* 36 B.R. 434, 436 (E.D.Mich.1983).[10]

The performance credits and other penalties are enforceable because they are reasonable. With the exception of the $25,000 penalty, the credits reflect the installation and monthly fees for the interconnection, network elements, or resale service at issue; they are patently reasonable. The $25,000 penalty is also reasonable, as it applies only when Ameritech violates the benchmark for a service requested by MCI to serve multiple customers. The Minnesota commission recently held that an identical $25,000 credit was reasonable:

> AT & T's proposed credits provide a reasonable estimate of the damages associated with failure to meet the quality standards in the contract. The credits included, for example, a $25,000 per day charge for an impermissible delay not specific to an individual customer. This amount pales next to U.S. West's daily intrastate revenues of approximately $2.5 million. Yet the impact of such a

---

*MCI's Arbitration with Ameritech Ohio,* No. 96–888–TP–ARB at 66 (Arbitration Decision) (JA 86) ( "MCI's statement that its proposal is based on its best judgment was never further explained"); *MCI's Arbitration with Wisconsin Bell,* No. 3258–MA–101 at 49 (Arbitration Decision) (JA 87) ("MCI's proposed benchmarks are not supported by analysis of Ameritech's actual procedures and performance, or even any explanation as to why it believed its standards were reasonable or relevant"). In contrast, here there was evidence to support MCI's proposed benchmarks and Ameritech's proposal was devoid of the necessary details.

8. This is not to say that benchmarks and penalties are required under the Act. *See U.S. West Comm., Inc. v. Hix,* 57 F.Supp.2d 1112, 1121–1122 (D.Colo.1999) (Supplemental Authority, Sept. 2, 1999, Ex. 3) (Act does not require detailed performance standards, only requires meaningful opportunity to compete).

9. Ameritech also contends that the benchmarks and penalties will necessarily increase its costs and that the pricing provisions do not include this increased cost. Ameritech argues that because the prices are not based on actual costs, the prices violate the Act. There is no evidence in the record to support Ameritech's claim that the benchmarks and penalties will increase its costs.

10. Ameritech claims that despite the fact that the Agreement states that the delay credits are "not intended to be liquidated damages," Agreement, Schedule 3.8.10 § 1.2 (JA 1), the credits are in fact liquidated damages because they are an attempt by parties to a contract to fix the amount of damages in advance. This Court presumes that the penalties in the Agreement are liquidated damages.

delay on the [competing carrier] could be substantial, steering its current or potential customers away form the [competing carrier] and creating long-standing harm to its reputation.

*Consolidated Petitions of AT & T,* No. P–442, slip op. at 57 (Minn. Pub. Util. Comm'n Dec. 2, 1996) (JA 80). *See U.S. West Comm., Inc. v. Hix,* 57 F.Supp.2d 1112, 1120–22 (D.Colo.1999) (Supplemental Authority, Sept. 2, 1999, Ex. 3) (commission had authority under Act to adopt penalties in order to provide opportunity to compete).

In sum, the MPSC had jurisdiction to adopt MCI's proposed benchmarks and penalties and did not act arbitrarily in doing so. Further, the benchmarks and penalties do not violate the Act and they are enforceable. Accordingly, the MPSC's decision to incorporate MCI's proposed benchmarks and penalties in the Interconnection Agreement is AFFIRMED.

## B. Two Hour Conversion Window and Five Minute Conversion Interval for Cutover of Unbundled Loops

 Ameritech contends that the time frames adopted by the Commission for providing unbundled loops to MCI are not technically feasible and that the Commission acted arbitrarily and capriciously. Under the Interconnection Agreement, MCI may obtain access to unbundled loops, the physical connections (usually wires) between the premises of a customer and the rest of the network. The Agreement, as approved by the MPSC, requires Ameritech to provide MCI access to local loops by performing loop cutovers within a two hour conversion window and a five minute conversion interval. The conversion window is the time within which Ameritech will install the loop. The conversion interval is the time period between disconnecting the local service and connecting a loop to the MCI interface point, that is, the time frame within which a customer's phone service may be disconnected in order to switch to MCI's service.

During arbitration, Ameritech opposed MCI's two hour conversion window and a five minute conversion interval and instead proposed that it be required to perform loop cutovers within a twelve hour conversion window and a sixty minute conversion interval. The Panel adopted MCI's proposal, finding that coordinated cutovers are not difficult engineering tasks, that coordinated cutovers are necessary to ensure use of unbundled loops without significant disruption, and that Ameritech's proposed conversion times would impair MCI's ability to offer service. Arbitration Decision at 33–34 (JA 17). The Commission adopted the Panel's decision without comment. First Approval Order at 2–3 (JA 20).

Incumbent LEC's are required to provide access and unbundled elements that are at least equal in quality to what the incumbent provides to itself, unless it is not technically feasible to do so. First Report and Order ¶ 313 (JA 45). Ameritech contends that MCI's cutover time frames are not technically feasible. Ameritech had the burden of proof on this issue. *Id.;* 47 C.F.R. § 51.311(b). "An incumbent LEC that claims that it cannot satisfy such request [for access to unbundled elements] because of adverse network reliability impacts must prove to the state commission by clear and convincing evidence that such interconnection, access, or methods would result in specific and significant adverse network reliability impacts." 47 C.F.R. § 51.5 (definition of "technically feasible"). A determination of technical feasibility must not include consideration of economic or site concerns. *Id.*

MCI presented evidence to the Panel that the cutover was a simple engineering task. MCI's witness, Mr. Geisy, testified that to actually hook up an unbundled loop to the cabling in MCI's collocated space is simple-it merely requires a technician to go to the main distribution frame and install a jumper wire. Tr. of Geisy testimony at 280–81 (JA 15). "When MCI gains an existing ILEC customer and needs that

unbundled local loop to serve that customer, then that local loop will need to be "cut over" from the ILEC to MCI. Mechanically, this is not a complex task; it only involves the movement of jumper wires on the MDF [main distribution frame]." MCI's Network Implementation Requirements at 24 (JA 4).

Ameritech claims that performing a "live" or "hot" cutover is more complicated than merely moving jumper wires. After the Arbitration Decision was rendered, Ameritech contended that cutover requires the following additional tasks: 1) coordination by phone between the Ameritech unbundling center and the technician in the central office; 2) coordination with the MCI representative in the office; 3) verifying that the loop is connected·to the line that MCI requested; and 4) when number porting is requested, verifying that the additional paths are installed correctly. Ameritech's Objections to Arbitration Decision at 32–33 (JA 18). Ameritech pointed to no evidence in the record in support of these allegations. Moreover, these additional tasks do not appear to be complex.

In addition to arguing that cutover is a complex process, Ameritech contends that it is costly to complete a cutover within MCI's time frames. Ameritech's witness, Scott Alexander, testified that MCI's short cutover time frames were not reasonable:

It would drastically increase the resources required to handle peak demand and make it virtually impossible to ensure seamless cutovers. While Ameritech makes every reasonable effort to coordinate "live" cutovers within a reasonable interval, the realities of service order volumes, order complexity, and the need to retain flexibility to accommodate CLEC-requested changes make it impossible to commit to this requirement. Furthermore, Ameritech cannot

agree to limit potential service disruptions to five minutes or less. This would require inefficient use of resources as multiple technicians would be required to have their hands on the same order at the same time to make the conversion so rapidly.

Testimony of Scott Alexander at 21–22 (JA 10). In essence, Alexander testified that rapid cutovers were not feasible because they require the use of more than one technician and thus they are costly. This evidence does not demonstrate technical infeasibility because a determination of technical feasibility must not include a consideration of increased costs. 47 C.F.R. § 51.5.

Alexander went on to state, "The practical considerations such as central office location, frame configurations, and physical access to the hardware and the operations support systems required to execute the cutover will not support the proposed 5 minute limitation." This statement was not supported by any evidence whatsoever.

In applying the arbitrary and capricious standard, the Court must give deference to the Commission's decision. The decision will be presumed valid if a reasonable basis exists for its decision, if the Commission's decision was based on a consideration of the relevant factors, and if there was no clear error of judgment. *Hix*, 986 F.Supp. at 18. Here the Commission did not err. Its decision was based on a consideration of the complexity and feasibility of the cutover time frames. Further, Ameritech had the burden of proving technical infeasibility. Because Ameritech did not submit evidence sufficient to meet its burden, the Commission's adoption of MCI's proposed cutover time frames is AFFIRMED.[11]

---

11. Ameritech also argues that the FCC has already rejected a five minute loop cutover interval, and thus, Ameritech implies, the five minute time frame must be technically infeasible. The FCC did decline to adopt a requirement that all loop cutover intervals be limited to five minutes. First Report and Order

¶¶ 373 & 387 (JA 45). However, the FCC did so without comment. The FCC did not opine as to the technical feasibility of such a time interval; it merely indicated that other rules regarding nondiscrimination "adequately address" the concern. *Id.* ¶ 387 (JA 45).

## C. Time Period for Bona Fide Request Process

██ Ameritech also appeals the Commission's adoption of MCI's proposed time period for processing of Bona Fide Requests (BFRs). Ameritech and MCI agreed that their Interconnection Agreement must contain a BFR process by which MCI could request new products or services not already provided by Ameritech as covered in the Agreement. The Act requires that incumbents provide network elements to competitors on the same terms as it provides those elements to itself. 47 C.F.R. § 51.313(b). The parties disputed the time period within which Ameritech should be required to process BFRs. Again, using the final offer arbitration method, the Panel adopted MCI's shorter time frame. Arbitration Decision at 31 (JA 17). The Commission adopted the Panel's Decision. First Approval Order at 2–3 (JA 20).

Ameritech proposed a 120 day time frame for processing of Bona Fide Requests as follows: Within the first thirty days, Ameritech would determine whether it is required to provide the requested product or service by the Telecommunications Act, whether it is technically feasible, and what the projected price would be. Then, if MCI directed Ameritech to continue to develop the product or service, Ameritech would have an additional ninety days to develop a final BFR Quote, including a product description, proposed rates, ordering intervals and procedures, and a statement of Ameritech's development costs.[12] In contrast to Ameritech's 120–day proposal, MCI proposed a thirty-five day time frame as follows: MCI originally proposed that Ameritech respond to BFR's within ten days. Later, MCI amended its position and proposed that Ameritech complete its initial determination within fifteen days, and that Ameritech develop its final BFR quote within an additional twenty days.

Ameritech contends that the Arbitration Panel's adoption of MCI's proposal was arbitrary and capricious because it was without record support and without adequate reasoning. MCI's evidence before the Panel consisted of a statement in its White Paper that an expedited BFR time frame was essential to competition and that a short time frame was adequate given that the BFR process requires MCI to provide identifying information and the major issue is technical feasibility. MCI's White Paper even supported MCI's initial proposal of a ten day BFR process.

Networks are dynamic structures. ILEC's are—hopefully-constantly improving them, adding new features and functions. In addition, ... MCI may find uses for other network functions that currently exist, but for which MCI has not specifically asked to be unbundled now.... Consequently, after this particular arbitration is completed, MCI will need to be able to request and gain access to network elements other than what will be specifically unbundled as a result of this process.

.... Significant delays in making unbundled network elements available may delay the advent of effective competition or may put new entrants at a significant competitive disadvantage in relation to the ILEC.... [A]s demonstrated by past practice in many cases, ILECs will take every opportunity to delay the availability of unbundled elements, given that they have no incentive to make available the unbundled elements that new entrants need.....

Consequently, a process must be established for further unbundling and that process must be expedited. .... The ILEC should have ten days to respond to this request. This relatively short period is sufficient given that the bona fide request process requires MCI to provide identifying information and that the major issue with regard to network elements is whether it is technically feasible to unbundle the element.

**12.** Ameritech agreed to process "certain less complicated" requests within thirty days.

Ancillary Arrangements and Services Requirements (MCI White Paper) at 28–29 (JA 3).

Ameritech's evidence on this issue consisted of the verified statement of Gregory Dunny, Vice President of Marketing and Sales for the network providers segment of Ameritech Information Industry Services:

Q. Is it reasonable to expect Ameritech to consistently produce time and cost estimates within ten days of receiving any BFR?

A. I do not think so. Ameritech has no way of controlling the number or complexity of BFRs it will receive at any one time. The determination of reasonable cost and availability dates may require substantial research, and should not be driven by unduly short deadlines. Further, Ameritech (sic) ability to respond to a BFR will also depend on the quality of the information submitted by the requestor, which Ameritech cannot control. By contrast, Ameritech's proposed BFR timetable allows for development of the technical feasibility analysis within 30 days and a complete response within a reasonable period (120 days). Moreover, if speed is essential to a requesting party, it can always seek to negotiate a different development schedule, provided it is willing to pay expedited development costs.

Dunny Statement at 85 (JA 12). While Dunny stated that MCI's originally proposed ten day period was not reasonable, he did not address MCI's later proposed thirty-five day period. Ameritech submitted no evidence regarding the thirty-five day period.

The Arbitration Panel adopted MCI's proposed time period,[13] finding that Ameritech's proposal would interject unnecessary delay into a straightforward process and would hinder competition. Arbitration Decision at 31–32 (JA 17). Ameritech contends that this finding lacked evidentiary support and explanation and thus was arbitrary.[14]

The Court must give deference to the Commission's decision under the arbitrary and capricious standard. Thus, the Court will presume that the Commission's decision was valid if a reasonable basis existed for it. *Hix*, 986 F.Supp. at 18. Here the Commission did not err. The Commission weighed the evidence and found that the BFR process is not complex. Because the BFR process is straightforward, because MCI is required to provide identifying information, and because the purpose of the Act is to establish and promote competition, the Commission adopted MCI's shorter time frame.[15] This decision is AF-

13. The Panel mistakenly stated that it was adopting the ten day time period initially proposed by MCI. In fact, the Panel adopted a thirty-five day period pursuant to MCI's amended proposal.

14. Ameritech also argued that the Commission should have adopted the 120–day time frame because, in the context of its Open Network Architecture ("ONA") Orders which were intended to spur competition among enhanced service providers, the FCC approved the use of a 120–day time frame for local carriers to process requests for new basic service arrangements, basic service elements, and complementary network service. *In the Matter of Filing and Review of Open Network Architecture Plans*, 4 FCC Rcd. 1, 205–06 ¶ 397 (Dec. 22, 1985). The ONA proceeding is not relevant here. Further, Congress's goal of bringing competition to the local exchange

market as reflected in the Telecommunications Act is more far-reaching than the FCC's goal for ONA of preserving competition and promoting network efficiency. *In the matter of Computer III Further Remand Proceedings: BOC Provision of Enhanced Services*, Further Notice of Proposed Rulemaking, 13 FCC Rcd at 21 ¶ 31 (1998) (JA 49).

15. Ameritech also argues that MCI's BFR time frame was rejected by the State commissions in the other four states served by Ameritech because MCI's time frames were not supported by evidence. *See* JA 79. *See also MCI Telecomm. Corp. v. Illinois Bell Telephone Co.*, No. 97C2225, slip op. at 25–26 (N.D. Ill. June 22, 1999) (Supplemental Authority, Sept. 2, 1999, Ex. 2) (court held that commission decision adopting longer BFR process was not arbitrary based on facts presented to commission in that case). These

FIRMED.

### D. Rights–of–Way

 Ameritech appeals the MPSC decision defining "rights-of-way" as used in the Telecommunications Act. Ameritech contends that the MPSC erred as a matter of law by broadly construing the term rights-of-way as including all rights in real property, so long as the property is used for distribution facilities. Ameritech contends that the term should be interpreted to mean only an easement or license and not a fee simple or leasehold interest in land. In other words, Ameritech contends that it is not required to provide MCI access to land which it owns or leases.

Section 251(b)(4) of the Telecommunications Act requires ILEC's to "afford access to the poles, ducts, conduits, and rights-of-way . , . to competing providers of telecommunications services on rates, terms, and conditions that are consistent with Section 224 of this Title." Section 224 governs the rates, terms and conditions under which access must be provided. Specifically, section 224(f)(1) requires that "a utility shall provide . . . nondiscriminatory access to any pole, duct, conduit or right-of-way owned or controlled by it." The FCC has explained that the access obligation of 224(f)(1) applies "when, as a matter of state law, the utility owns or controls the right-of-way to the extent necessary to permit such access." First Report and Order ¶ 1179 (JA 45).

The Arbitration Panel applied Michigan law and held that "rights-of-way includes property owned, leased or otherwise controlled by Ameritech, not just real estate owned by third parties." Arbitration Decision at 54 (JA 17). The Panel relied on *Westman v. Kiell,* 183 Mich.App. 489, 493–495, 455 N.W.2d 45, 47 (1990), quoting its holding as follows:

A railroad may acquire in a strip of real property for use as a right-of-way, as in any real property, a fee simple absolute,

a determinable fee, an easement, a lease, or a license, as may any other corporate entity or individual. The character of the interest acquired is determined by the language of the conveyance.

The Panel reasoned that Congress did not intend a competitor's access to incumbent's rights-of-way to be dependent upon the type of real property interest that the incumbent holds in the real estate over which the right of way passes. "The purpose of § 224(f)(1) is to ensure that no party can use its control of the enumerated facilities and property to impede, inadvertently or otherwise, installation and maintenance of telecommunication and cable equipment by those seeking to compete in these fields." Arbitration Decision at 55 (JA 17). The MPSC adopted the Panel's decision and clarified that rights-of-way refers only to property that is used for distribution facilities:

[T]he definition of rights-of-way should be revised to clarify that Ameritech Michigan is not obligated to create new rights-of-way across its own property. Accordingly, "rights-of-way" should include easements, licenses, or any other right, whether based upon grant, reservation, contract, law, or otherwise, to use property if the property is used for distribution facilities.

First Approval Order at 8 (JA 20).

Ameritech argues that this interpretation is overly broad and that the FCC specifically stated that an overly broad interpretation of the term rights-of-way should be avoided. First Report and Order ¶ 1185 (JA 45). The FCC went on to explain that the purpose of allowing access to rights-of-way is to permit competitors to "piggyback" along distribution networks, not to require unrestricted access to an ILEC's land or facilities. *Id.*

Upon reviewing this issue *de novo,* the Court finds that the MPSC's definition of "rights-of-way" is not overly broad. The

decisions are not persuasive here because they are based on their unique records. This Court must review only the record before it,

and here the Commission acted reasonably when it adopted MCI's shorter time frames.

MPSC did not require Ameritech to provide unrestricted access to its land and equipment. It only required Ameritech to permit MCI to piggyback on its distribution facilities by mandating that Ameritech provide MCI access to rights-of-way if the property is used for distribution facilities-regardless of whether Ameritech's property interest is by easement, lease, or fee simple ownership. It simply does not make sense to argue that Congress intended access to rights-of-way to be dependent upon the specific type of real estate interest held by the incumbent.

Ameritech also argues that the Arbitration Panel erred by relying on and misinterpreting *Westman v. Kiell*, 183 Mich. App. 489, 455 N.W.2d 45 (1990). Ameritech contends that the Court should apply the plain meaning of the term "rights-of-way," the term means only an easement, and the broader definition set forth in *Westman* applies only to railroad cases. To the contrary, *Westman* expressly recognized that any party, not just a railroad, may acquire an interest in real property for use as a right-of-way via a variety of different legal interests. "A railroad may acquire in a strip of real property for use as a right of way ..., a fee simple ..., an easement, a lease, or a license, *as may any other corporate entity or individual.*" *Westman*, 183 Mich.App. at 493, 455 N.W.2d at 47. (emphasis added) Under Michigan law, the term rights-of-way refers both to the right to use the property of others as well as to the property that an entity owns or leases for distribution facilities. *Quinn v. Pere Marquette Ry. Co.*, 256 Mich. 143, 150, 239 N.W. 376, 379 (1931) (rights-of-way has two meanings, the strip of land on which railroad track is laid as well as the legal right to use the strip). Accordingly, the MPSC's interpretation of the term "rights-of-way" is consistent with the Act and the regulations and is AFFIRMED.

### E. Dark Fiber

■ Ameritech also appeals the MPSC's decision requiring Ameritech to provide "dark fiber" to MCI as an unbun-

dled network element. Dark fiber is an unequipped fiber optic strand without any electrical or optical transmission equipment attached at either end. The fiber is called "dark" because it lacks the equipment that illuminates the fiber. In other words, dark fiber is fiber optic transmission cable that has been installed for future use and is not currently being used.

Section 251(c)(3) of the Act requires incumbents to provide competitors with unbundled access to the elements of their networks. The Act defines "network element" as "a facility or equipment *used* in the provision of a telecommunications service. Such term also includes features, functions, and capabilities that are provided by means of such facility or equipment . . . or used in the transmission, routing, or other provision of telecommunications service." 47 U.S.C. § 153(29) (emphasis added); First Report and Order ¶ 261 (JA 45).

The Act directs the FCC to carry out the Act's provisions by issuing regulations. 47 U.S.C. § 251(d). The FCC required that incumbents lease on an unbundled basis seven different network elements. 47 C.F.R. § 51.319(c) & (d); First Report and Order ¶ 27 (JA 45). In determining which network elements must be unbundled, the FCC interpreted the "necessary and impair" provision of the Act:

> In determining what network elements should be made available for purposes of subsection (c)(3), the [FCC] *shall consider, at a minimum,* whether—
>
> (A) access to such network elements as are proprietary in nature is *necessary;* and
>
> (B) the failure to provide access to such network elements would *impair* the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer.

47 U.S.C. § 251(d)(2) (emphasis added).

Rule 319, the list of seven elements that must be unbundled, did not include dark fiber. Dark fiber was not included because the FCC determined that it lacked

sufficient information to decide whether dark fiber was a network element. *Id.* at ¶ 450.

Even though the FCC did not list dark fiber as a standard element that must be provided on an unbundled basis, pursuant to FCC Rule 317, a State commission may require any network element to be provided on an unbundled basis, including dark fiber, by applying the "necessary and impair" provision of the Act. 47 C.F.R. § 51.317.

Here, the Arbitration Panel concluded that Ameritech must provide MCI access to its dark fiber, holding as follows:

> Under FCC Order ¶ 281, there is a presumption in favor of unbundling if it is technically feasible. MCI desires access to "dark fiber" and there is no technical obstacle to unbundling "dark fiber." Section 3(29) of the Act defines the term "network element" to include "a facility or equipment used in the provision of a telecommunications service" (FCC Order ¶ 249). The Panel notes that the FCC's Order, ¶ 262, concludes that the definition of the term "network element" broadly includes all "facilities or equipment used in the provision of a telecommunications service." Even though the FCC in its Order at ¶ 450 declined at the time to address the unbundling of an ILEC's dark fiber, the Panel finds that Ameritech's dark fiber should be available to MCI. The Panel believes this interpretation is proper noting that not all fiber is dark. To decline MCI the use of dark fiber, in the Panel's opinion, would be like asking to deny MCI the use of an unused unbundled loop simply because that specific loop is not being used.

Arbitration Dec. at 27–28 (JA 17), adopted by the MPSC without comment, First Approval Order at 2–3 (JA 20).

Count X of Ameritech's Complaint before this Court alleges that the MPSC improperly required Ameritech to offer dark fiber as an unbundled network element. Ameritech contends that 1) dark fiber is not a "network element" and 2) the MPSC erred by failing to apply the impairment test in determining that dark fiber must be unbundled.

District Courts and State commissions are split on the issue of whether dark fiber is a "network element." Ameritech relies on the minority view that dark fiber is not a network element because, by its very nature, it is not *currently* being used to provide services. Of the federal district courts that have decided the issue, only one has found that dark fiber is not a network element. In *MCI Telecommunications Corp. v. Pacific Bell,* No. C 97–0670 SI, 1988 U.S. Dist. Lexis 17556 (N.D.Cal. Sept. 29, 1998) (JA 57), the court held that dark fiber was not a network element because it could not be "used" until the requisite equipment was attached to the ends. Dark fiber was in the nature of unused inventory which the Act did not require incumbents to provide to competitors. *Id.* at *75. "While MCI is correct that 'used' is not the same as 'currently used,' it does not follow that 'used' necessarily means 'will be used.'" *Id.* Six State commissions have similarly held that dark fiber is not a network element because it is not currently being used to provide telecommunications service. *See* Orders of State commissions from Cal., Fla., La., N.Y., Pa., and Ind. excerpts at JA 76.

In contrast, the majority view is that dark fiber is a network element. *US West Comm., Inc. v. Jennings,* No. CV 97–26–PHX–RGS–OMP, 1999 WL 284888, at *15 (D.Ariz. May 4, 1999) (Supplemental Authority, June 22, 1999, Ex. 4); *US West Communications Inc. v. AT & T Communications of the Pacific Northwest, Inc.,* 46 F.Supp.2d 1068, 1080–1081 (D.Or.1999) (Supplemental Authority, June 22, 1999, Ex. 5), *reaffirming earlier decision in, U.S. West Communications, Inc. v. AT & T Communications of Pacific Northwest, Inc.,* 31 F.Supp.2d 839, 854 (D.Or.1998); *US West Comm., Inc. v. Garvey,* No. 97–913, at *26 (D.Minn. Mar. 30, 1999) (JA 69); *MCI Telecomm. Corp. v. BellSouth Telecomm., Inc.,* 40 F.Supp.2d 416, 428–

429 (E.D.Ky.1999) (JA 58); *MCI v. Bell–Atlantic,* 36 F.Supp.2d 419, 423 (D.D.C. 1999) (JA 55) (reversing *Matter of AT & T,* Arb. Dec. (D.C. Pub. Serv. Comm'n Dec. 2, 1996) (excerpt at JA 76)); *US West v. Thoms,* 1997 WL 880744 No. 4–97–CV–70082, at \*40 (S.D.Iowa Jan.25, 1999) (JA 73); *US West Comm., Inc. v. AT & T Corp.,* No. A1–97–085, at \*15–16 (D.N.D. Jan. 8, 1999) (JA 68); *Southwestern Bell Telephone Co. v. AT & T Comm. of the Southwest, Inc.,* No. 97CA132SS, 1998 WL 657717, at \*6 (W.D.Tex. Aug.31, 1998) (JA 66); *US West v. AT & T,* No. C97–1320R, at \*14–16 (W.D.Wash. July 21, 1998) (JA 67); *MCI Telecomm. Corp. v. U.S. West Comm., Inc.,* No. C97–1508R, at \*14–15 (W.D.Wash. July 21, 1998) (JA 61); *MCIMetro Access Trans. Servs., Inc. v. GTE Northwest, Inc.,* No. C–97–742WD, 1009 U.S. Dist. Lexis 11335, at \*13–14 (W.D.Wash. July 7, 1998); *MCI Telecommunications Corp. v. BellSouth Telecommunications, Inc.,* 7 F.Supp.2d 674, 680 (E.D.N.C.1998); *MCI v. Bell Atlantic–Virginia, Inc.,* No. 3:97CV629, 1998 U.S. Dist. Lexis 17558, at \*20–21 (E.D.Va. July 1, 1998) (JA 56). Twelve State commissions have also held that dark fiber is a network element. *See* Orders of State commissions from Tenn., Ohio, Ga., Tx., Minn., Iowa, Ill., Or. (2), Ariz., Ky., and Wash. excerpts at JA 77.

The majority view is better reasoned. These courts that hold that dark fiber is a network element find that dark fiber is more a part of the network than it is a part of inventory. "This court agrees with MCI that dark fiber is completely different from the rolls of copper wire and stacks of switches alluded to by BellSouth, because dark fiber is already in the ground.... In some cases, ... it is wound around 'lit' fiber inside the same sheathing." *MCI v. BellSouth,* 7 F.Supp.2d at 679; *accord MCI v. Bell–Atlantic,* 36 F.Supp.2d at 424. In addition, the FCC held that, under the predecessor to the 1996 Telecommunications Act, dark fiber was a "wire communication." Because the FCC considers it a wire communication, dark fiber should also be considered a network element, which is defined as equipment used to provide telecommunications services. *MCI v. Bell-South,* 7 F.Supp.2d at 679–80; *accord MCI v. BellSouth,* 40 F.Supp.2d 416, 424 (E.D.Ky.1999) (JA 58). Further, the Supreme Court in *AT & T Corp. v. Iowa Utilities Board,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), recently recognized the breadth of the definition of "network element." *MCI v. Bell–Atlantic,* 36 F.Supp.2d at 424 (citing *IUB,* 119 S.Ct. at 734 (definition is broad and includes more than physical facilities)). Moreover, the definition of "network element" must be broad to be consistent with the Act.

> A limiting definition of network element, such as the one offered by U.S. West, would allow an ILEC to avoid making equipment available to CLECs merely because the equipment is not currently in use. For example, a local loop servicing a particular residence, which is in all other respects a network element, would not be available to CLEC if the house was temporarily vacant and not subscribing to telephone service. This result is inconsistent with the scope of the language of the Act as interpreted by the FCC. See 47 C.F.R. § 51.319(a) (providing that an ILEC must provide nondiscriminatory access to local loops on an unbundled basis).

*US West v. Thoms,* No. 4–97–CV–70082, at \*40 (S.D.Iowa Jan.25, 1999) (JA 73). In sum, the majority view that dark fiber is a network element rests on firmer ground.

While the MPSC correctly determined that dark fiber was a network element, the Commission erred by applying only the technical feasibility test. The MPSC simply determined that it was technically feasible to unbundle dark fiber and then concluded that it must be unbundled. Arbitration Dec. at 27–28 (JA 17). The Supreme Court recently rejected the idea that an element must be unbundled simply because it is feasible to do so. *AT & T Corp. v. Iowa Utilities Board,* 525 U.S. 366, 119 S.Ct. 721, 736, 142 L.Ed.2d 835 (1999) (*IUB*). The Act requires that in-

cumbent carriers like Ameritech provide access to network elements on an unbundled basis at any technically feasible point. 47 U.S.C. § 251(c)(3). The Supreme Court explained that the FCC misinterpreted section 252(c)(3) to mean that ILECs must provide access to network elements whenever it is technically feasible to do so. Section 251(c)(3) indicates *where* unbundled access must occur, not *which* elements must be unbundled. *IUB*, 119 S.Ct. at 736.

The Commission also erred by failing to apply the necessary and impair test as required by Rule 317. Section 251(d)(2)(B) provides that "the commission *shall consider, at a minimum*, whether ... the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the service it seeks to offer" (emphasis added). Section 251(d)(2)(B), which is directed toward the FCC, applies equally to the State commissions via Rule 317. Rule 317 provides that a State commission may require unbundling beyond the seven elements identified in Rule 319 if, after applying the FCC's interpretation of the necessary and impair section, it determines that unbundling is required. Consideration of the impairment test is mandatory, as the statute uses the word "shall." Thus, the MPSC erred by failing to apply the impairment test.

Having found that dark fiber is a network element and the MPSC erred by failing to apply the necessary and impair rule, Rule 317, the Court must then determine whether to reverse, stay, or remand the issue of whether Ameritech is required to provide unbundled access to dark fiber in light of the Supreme Court's ruling in *IUB*.

In *IUB*, the Supreme Court held that the FCC's interpretation of the necessary and impair rule was too broad and did not impose proper limits on the Act's unbundled access requirements. *Id.* at 735–36. The Court vacated FCC Rule 319, which specified which elements must be unbundled, because it was based on an erroneous interpretation of the necessary and impair rule. The Court remanded the case for the FCC to establish a new interpretation, and to determine which network elements must be unbundled based on that new interpretation. *Id.* at 736.

In *IUB*, the Supreme Court also impliedly vacated FCC Rule 317. *MCI v. Bell–Atlantic*, 36 F.Supp.2d 419, 424 n. 4 (D.D.C.1999) (although *IUB* did not reach issue of validity of Rule 317, *IUB* holding is equally applicable to Rule 317) (JA 55).[16] "Although *IUB* did not expressly vacate Rule 317, the rule purports to allow state commissions to apply the same erroneous standard that was fatal to Rule 319. Therefore, the reasoning of *IUB* applies with equal force to Rule 317." *MCI Telecomm. Corp. v. Illinois Bell Telephone Co.*, No. 97C2225, slip op. at 35 (N.D.Ill. June 22, 1999) (Supplemental Authority, Sept. 2, 1999, Ex. 2). Because the FCC's interpretation of the necessary and impair section was erroneous, the application of the FCC interpretation by any State commission was erroneous.

On September 15, 1999, the FCC announced that it has promulgated new regulations. FCC, Report No. CC 99–41, FCC Promotes Local Telecommunications Competition: Adopts Rules on Unbundling Network Elements (Sept. 15, 1999) [hereinafter FCC's Sept. 15, 1999 Announcement] (Supplemental Authority, Sept. 20, 1999, Ex. 1). The text of these regulations is currently unavailable. However, the FCC's announcement included a summary of these rules. The new rules require incumbents to provide unbundled access to dark fiber. *Id.* at 3. The FCC also announced that it has adopted "a standard for determining whether incumbents must

---

**16.** The issue of the "continuing validity and potential disposition" of Rule 317 is being briefed in the Eighth Circuit, and is scheduled for oral argument. *Iowa Utilities Board v.*

*FCC*, Case No. 96–3321 *2 (8th Cir. June 10, 1999) (*IUB* on remand), MCI's Notice of Supplemental Authority Ex. 3.

unbundle a network element." *Id.* at 1 & 4.

Ameritech argues that the MPSC's ruling on dark fiber should be reversed because there was no rule in existence at the time which required Ameritech to provide dark fiber on an unbundled basis. *See MCI Telecomm. Corp. v. Illinios Bell Telephone Co.,* No. 97C2225, slip op. at 35 (N.D.Ill. June 22, 1999) (Supplemental Authority, Sept. 2, 1999, Ex. 2) (because state commission did not apply necessary and impair test then in effect, district court reversed decision requiring incumbent to provide unbundled access to dark fiber). The Interconnection Agreement provides that when there are changes in the law, the parties must renegotiate the affected terms and conditions in good faith. Agreement § 29.3 (JA 1). Ameritech argued that if the FCC changed the law, the parties would then have to renegotiate. The FCC now has changed the law, as the September 15 announcement indicates that the new regulations require incumbents to provide dark fiber on an unbundled basis.

Instead of reversing, MCI contends that the Court should stay its decision under the doctrine of primary jurisdiction, and rule when the text of the new unbundling regulations is available. The doctrine of primary jurisdiction provides that a court may stay its decision on a claim when "enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pacific R.R.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). While there is no precise formula for applying the doctrine, it is proper to defer to the expertise of an agency when the issue is specialized or technical and when deference would ensure national uniformity. Here, Congress delegated to the FCC the task of promulgating regulations interpreting the Telecommunications Act. Further, "[t]he advisability of invoking primary jurisdiction is greatest when the issue is already before the agency." *Mississippi Power & Light*

*Co. v. United Gas Pipe Line Co.,* 532 F.2d 412, 420 (5th Cir.1976).

This Court rejects both Ameritech's request that it reverse the MPSC and MCI's request that it stay its decision. Instead, the Court finds that the better course is to remand this issue to the MPSC. Most courts faced with this issue have declined to issue a stay and instead have remanded the issue of which elements must be unbundled to the State commission for consideration in light of the FCC's new regulations. *See e.g., U.S. West Communications, Inc. v. AT & T Communications of the Pacific Northwest, Inc.,* 46 F.Supp.2d 1068, 1080–1081 (D.Or. 1999) (Supplemental Authority, June 22, 1999, Ex. 5); *US West Comm., Inc. v. Garvey,* No. 97–913, at * 28 (D.Minn. Mar. 30, 1999) (JA 69); *US West Comm., Inc. v. Minnesota Public Utilities Comm'n,* 55 F.Supp.2d 968, 983–984 (D.Minn.1999) (JA 72). It is the state commission that should apply a new regulation in the first instance. *US West Comm., Inc. v. AT & T Comm. of Pacific Northwest, Inc.,* 46 F.Supp.2d 1068, 1081–1082 (D.Or.1999) (Supplemental Authority, June 22, 1999, Ex. 5).

In *US West Comm., Inc. v. Thoms,* No. 4–97–70082 (S.D.Iowa Apr. 19, 1999) (JA 74), the Iowa district court remanded the issue of whether the incumbent carrier must provide unbundled access to dark fiber. In *Thoms,* the court denied MCI's request for a stay under the doctrine of primary jurisdiction, noting "[i]t is extremely unlikely that the FCC's new regulations would allow this court, as MCI suggests, to adjudicate the dark fiber issue on the record as it exists. Rather, this court would eventually have to remand the issue to the Board for a determination, in the first instance, of whether the provision of dark fiber satisfies the new standard." *Id.* slip op. at 7. The court reasoned that the state commission was better equipped to handle such a determination because of its specialization, insight gained by experience, and more flexible procedures. "On

remand, the Board can determine whether there is another basis for requiring the ILEC to provide dark fiber, whether it should delay the determination until after the FCC's new rules are released, or whether it should take another course of action." *Id.* Here, on remand, the MPSC can determine under the new regulations whether Ameritech should provide to MCI unbundled access to dark fiber. Accordingly, the issue of whether Ameritech must provide dark fiber to MCI on an unbundled basis is hereby REMANDED to the MPSC for decision in light of the new FCC regulations.

### F. Access to Loop Distribution

 MCI appeals the MPSC's decision not to require Ameritech to provide immediate unbundled access to loop distribution. The MPSC instead required that MCI apply for such access through the Bona Fide Request process. Based on the doctrine of primary jurisdiction, MCI asks the Court to stay its decision on this claim until the FCC issues its new regulations.

The Act requires that incumbent carriers like Ameritech provide access to network elements on an unbundled basis at any technically feasible point. 47 U.S.C. § 251(c)(3). Here, MCI sought unbundled access to loop distribution, a portion of the local loop. The local loop, which connects an end office switch to a customer, can be divided into subloop elements as follows: loop distribution, loop concentrator/multiplexor,[17] and loop feeder. Loop distribution is the line from the customer to the loop concentrator/multiplexor which concentrates the distribution lines into loop feeder lines that carry calls to the switch.

The MPSC found that "subloop unbundling (a) is not technically feasible in all instances, and (b) even where it is technically feasible, presents price and network reliability issues that cannot be resolved on a 'one size fits all' basis." Arbitration Decision at 30 (JA 17). The Arbitration Decision noted that offering loop distribution through the Bona Fide Request pro-

cess on a case-by case basis is consistent with the FCC's decision not to designate loop distribution as a standard network element that must be unbundled due to technical feasibility issues. First Report and Order ¶ 391 (JA 45).

MCI contends that the Court should stay its decision, under the doctrine of primary jurisdiction, until after the FCC issues its new unbundling regulations. Ameritech argues that the Court should not stay its decision because the FCC's new regulations on unbundling will not affect the MPSC decision in this case, as the MPSC determined that it is not technically feasible to unbundle loop distribution.

Ameritech overstates its case. The MPSC only found that subloop unbundling was not feasible in *all* instances. The MPSC found that "subloop unbundling (a) is not technically feasible in all instances, and (b) even where it is technically feasible, presents price and network reliability issues that cannot be resolved on a 'one size fits all' basis." Arbitration Decision at 30 (JA 17). By implication, the MPSC found that unbundling *is* feasible in *some* instances. Ameritech cannot be required to provide unbundled access to loop distribution where it is not technically feasible. Where it is not feasible to unbundle loop distribution, the decision of the MPSC is AFFIRMED.

However, wherever it is technically feasible to unbundle loop distribution, Ameritech can be required to provide it to MCI. The FCC's September 15, 1999 announcement indicates that the new regulations require incumbents to provide unbundled access to subloops, or portions of the loop, at any accessible point. FCC's Sept. 15, 1999 Announcement, at 3 (Supplemental Authority, Sept. 20, 1999, Ex. 1). Thus, like the issue of dark fiber, the issue of whether Ameritech is required to provide to MCI unbundled access to loop distribution (where technically feasible) is REMANDED to the MPSC for decision in light of the new FCC regulations.

17. The loop concentrator/multiplexor is also known as the feeder distribution interface.

### G. Prices for Local Switching in Conjunction with Common Transport

■ MCI contends that the Interconnection Agreement's prices for local switching provided in conjunction with common transport violate the 1996 Act, the FCC's regulations, and the Michigan Telecommunications Act. "Local switches" direct calls to their destination; "shared" or "common transport" consists of transmission facilities that link the switches, where such facilities are shared by more than one carrier.

The statutes and regulations require that pricing of unbundled network elements must be based on the "forward-looking long-run incremental cost" of providing that element. First Report and Order ¶¶ 620 & 672 (JA Ex. 45). *See also* 47 U.S.C. § 252(d)(1); 51 C.F.R. § 51.503(b); Mich. Comp. Laws Ann. § 484.2352. Prices must be based on the Total Element Long Run Incremental Cost (TELRIC), which includes a "reasonable allocation of forward-looking joint and common costs." First Report and Order ¶¶ 620 & 672 (JA Ex. 45). That means that the rate Ameritech charges for local switching must be based on the costs that an efficient firm in a competitive market would incur to provide local switching using the most current, efficient technology. *See* 47 C.F.R. § 51.505(b). A state commission cannot approve prices intended to subsidize other network elements. *Id.* § 51.505(d)(4). *Cf. AT & T Corp. v. Iowa Utilities Board,* 525 U.S. 366, 119 S.Ct. 721, 729–33, 142 L.Ed.2d 835 (1999) (FCC has jurisdiction to promulgate uniform pricing policies), *on remand, Iowa Utilities Board v. FCC,* Case No. 96–3321 ¶ 1 (8th Cir. June 10, 1999) (FCC pricing rules reinstated) (Supplemental Authority, June 22, 1999, Ex. 3). In this way, new entrants to local telecommunications markets can have competitive retail rates. *See* First Report and Order ¶ 679 (JA 45).

MCI argues that the local switching prices established in Ameritech's tariff and incorporated into the Interconnection Agreement are not based on this pricing method, but instead are based on business resale rates for local calls or switched access rates for long-distance calls. MCI requests that this Court remand this issue to the MPSC and direct the MPSC to reform the Interconnection Agreement to set local switching rates that are based on forward-looking long-run incremental costs.

MCI misreads Ameritech's tariff. It does not set any rate for local switching. Instead, it provides that the price for local switching must be determined through the Bona Fide Request (BFR) process. The tariff states:

> *Common Transport*–Like Service, as described in Section 12 of the Part, is provided pursuant to the Commission order of the Michigan Public Service Commission issued July 14, 1997 in Case No. U–11280 and *may be combined with Unbundled Local Switching upon receipt of a Bona Fide Request* as described in Section 1 (Combining Network Elements) of this Part.

Ameritech Tariff MPSC No. 20R, Part 19, Sec. 3, Original Sheet No. 22 n.1 (JA 31) (emphasis added). *See also Id.* at Original Sheet Nos. 2–3 (describing Bona Fide Request process).

The rates that MCI complains of are rates for things other than unbundled local switching in conjunction with common transport. Ameritech explains how to read the tariff:

> The important column of the Usage Billing Matrix on Original Sheet 26 [JA31] is labeled "TO," which indicates how the CLEC customer's call, traveling from the ULS unbundled port line ("ULP–A" in the matrix), will exit the switch for carriage to its ultimate destination. Only one row in the matrix, the fourth, refers the Common Transport–Like Service ("CT–Like") in the "TO" column, which means that this is the only situation in which the CLEC would be using a ULS/"common transport" combination. The "CHARGES BILLED" col-

umn for that configuration refers back to footnote 1 on Original Sheet No. 22, which, as noted above, states that prices for any ULS/ "common transport" combination must be determined through a Bona Fide Request. All of the other listings in the "TO" column refer to some means of carrying a call out of the switch other than through Common Transport–Like Service, such as another unbundled line port ("ULP-A") in the same switch, an unbundled trunk port of the purchasing CLEC ("UTP-A") or another CLEC ("UTP-B"), or use of Ameritech's public switched network ("PSN") on a resale basis.

Ameritech's Response at p. 5 n. 2. Ameritech contends that MCI must use the BFR process to determine the rate for local switching used in conjunction with common transport, and thus that MCI's claim that the rate for unbundled local switching is illegal must be dismissed as premature.

Ameritech's contention that MCI must use the BFR process lacks merit because Ameritech was required to set a tariff for local switching in conjunction with common transport. Ameritech failed to fully implement the order of the district court in *Michigan Bell v. Strand,* 26 F.Supp.2d 993, 1000–01 (W.D.Mich.1998), which required Ameritech to provide common transport. *See* FCC's Sept. 15, 1999 Announcement, at 3 (Supplemental Authority, Sept. 20, 1999, Ex. 1) (incumbents must provide unbundled access to shared transport).[18]

The Interconnection Agreement between MCI and Ameritech provided for interim prices for interconnection, access to network elements, and resale services. The interim prices were superseded by prices established by the MPSC in case no. U–11280. In Case No. U–11280, the Commission repeatedly ordered Ameritech to fully implement the requirement that it provide common transport to MCI.

In that proceeding, the Commission ruled that Ameritech was required to provide common transport to MCI and ordered Ameritech to "make revisions incorporating this requirement in its tariffs." Commission Order, July 14, 1997 at 29–30 (JA 30). Ameritech filed revised tariffs, and MCI objected to the revised tariffs. MCI and Ameritech moved for rehearing. The Commission granted rehearing and ordered Ameritech to correct certain deficiencies in its tariffs. The Commission ordered Ameritech to file tariffs that "fully implement" the common transport obligations. The Commission did not address the specific issue raised here, MCI's claim that the tariff for local switching included improper charges. Commission Order, Jan. 28, 1998 at 23 (JA 38). Ameritech again filed revised tariffs, and MCI again objected to the tariffs. The Commission resolved certain other issues, but still did not address the specific issue MCI raises here. Commission Order, June 26, 1998 (JA 40).

18. As a result of the Supreme Court ruling in *IUB,* Ameritech also argued that the MPSC and the Western District did not have authority to require Ameritech to provide common transport. Because Ameritech could not be required to provide common transport, Ameritech contended that the issue MCI raises here, regarding the price for local switching in conjunction with common transport, is moot. Any change in FCC unbundling regulations resulting from the Supreme Court's ruling in *IUB* is irrelevant because Ameritech is bound by contract to provide common transport. *See e.g., U.S. West Comm., Inc. v. Thoms,* No. 4–97–70082, slip op. at 12 n.8 (S.D.Iowa Apr. 19, 1999) (JA 74) (*IUB* does not change number or nature of network ele- ments incumbent must provide to competitors under interconnection agreements); *MCI Telecommunications Corp. v. GTE Northwest Inc.,* No. 97–1687-JE, slip op. at 9–11 (D.Or. Apr. 21, 1999) (JA 59) (GTE must provide unbundled elements under interconnection agreement unless and until court or commission relieves it of its contractual obligation);*U.S. West Comm., Inc. v. Jennings,* 46 F.Supp.2d 1004, 1026 (D.Ariz.1999) (Supplemental Authority, June 22, 1999, Ex. 4) (same); *US West Comm. Inc. v. AT & T Comm. of Pacific Northwest, Inc.,* 46 F.Supp.2d 1068, 1081–1082 (D.Or.1999) (Supplemental Authority, June 22, 1999, Ex. 5) (same).

■ The Commission's order that Ameritech provide common transport was affirmed on appeal to the district court. *Michigan Bell v. Strand,* 26 F.Supp.2d 993 (W.D.Mich.1998). Because Ameritech was required to provide common transport and was ordered to set a tariff for this element, MCI is not required to undergo the BFR process. The BFR process is for requests for services that are not otherwise provided by the Interconnection Agreement. Agreement ¶ 2.2 (JA 1). In other words, the BFR process is not for services that are already provided by the Agreement, like local switching in conjunction with common transport. *See MCI Telecomm. Corp. v. Illinois Bell Telephone Co.,* No. 97C2225, slip op. at 9–13 (N.D. Ill. June 22, 1999) (Supplemental Authority, Sept. 2, 1999, Ex. 2) (where competitor is entitled to common transport, it should not have to go through BFR process).

Pursuant to the Commission's order that Ameritech must provide common transport and must fully implement the order, this Court REMANDS the issue of the price of local switching in conjunction with common transport to the Commission. The Commission shall reform the Interconnection Agreement to set local switching prices (in conjunction with common transport) that are based on forward-looking long-run incremental costs as required by the Act and the federal regulations.

### H. Tandem Interconnection Rate

■ The Interconnection Agreement requires Ameritech to pay MCI the end office rate, not the tandem interconnection rate, for calls that Ameritech delivers to MCI for transport and termination. MCI claims that it should be compensated at the higher tandem rate because its fiber ring functions as a tandem switch.

The Act requires that parties to an interconnection agreement pay each other reciprocal compensation, that is, each party must pay the other for transporting and terminating on its network calls that originate on the other's network. 47 U.S.C. §§ 251(b)(5) & 252(d)(2)(A). The compensation must be based on the cost of transporting and terminating the call. *Id.* Cost varies, depending on how many switches the call is routed through, among other things. The cost of transporting a call through a tandem switch (a switch that connects other switches) and then to an end office switch (a switch which routes the call to its destination through a local loop), is more than the cost of transporting a call directly to an end office switch.

The FCC in its First Report and Order adopted pricing rules which covered reciprocal compensation arrangements. The FCC determined that where a competing carrier's switch or other technology serves a geographic area comparable to the incumbent's tandem switch, then the competing carrier is entitled to be compensated at the higher tandem rate.

[S]tates may establish transport and termination rates in the arbitration process that vary according to whether the traffic is routed through a tandem switch or directly to the end-office switch. In such event, *states shall also consider whether new technologies (e.g., fiber ring or wireless networks) perform functions similar to those performed by an incumbent LEC's tandem switch* and thus, whether some or all calls terminating on the new entrant's network should be priced the same as the sum of transport and termination via the incumbent LEC's tandem switch. *Where the interconnection carrier's switch serves a geographic area comparable to that served by the incumbent LEC's tandem switch, the appropriate proxy for the interconnecting carrier's additional costs is the LEC tandem interconnection rate.*

First Report and Order ¶ 1090 (emphasis added) (JA45); 47 C.F.R. § 51.711(a)(3).

MCI uses a fiber optic ring to aggregate and route calls. MCI argues that its fiber ring operates like a tandem switch and thus it should receive the tandem interconnection rate no matter where Ameritech actually connected to MCI's network. The Arbitration Panel rejected MCI's claim. The Panel found that MCI did not provide sufficient evidence that MCI's "switch"

(i.e. fiber ring) serves a geographic area comparable to the area served by Ameritech's tandem switch. Arbitration Decision at 20 (JA 17). MCI currently does not have the authority to serve every exchange in the Detroit Local Access and Transport Area (LATA).[19] The Panel determined that Ameritech should pay the separate end office and tandem rates based on the point of interconnection with MCI's network. Arbitration Decision at 20 (JA 17). The MPSC adopted the Panel's decision. First Approval Order (JA 20).

MCI contends that it will soon have authority to serve every exchange in the Detroit LATA, and that the MPSC erred as a matter of law because it misinterpreted the regulation. MCI contends that to implement the purpose of the Act to shift monopoly markets to competition quickly, the regulations should not be interpreted to require a competing carrier to currently have authority for every exchange in a LATA.

MCI challenges the MPSC's decision as a matter of law, and thus this Court applies a de novo standard of review.[20] The Court finds that MCI's interpretation of the FCC regulation is unreasonable. The FCC rule provides that where the competing carrier's switch *serves* a geographic area comparable to that served by the incumbent carrier's tandem switch, the rate to be charged is the tandem interconnection rate. The rule focuses on the area currently being served by the competing carrier, not the area the competing carrier may in the future serve. To interpret the rule in the manner that MCI proposes would require the state commission to speculate about the future capability of a competing carrier.

MCI also argues that the MPSC erred as a matter of law because it compared the capacity of the fiber ring to the capacity of all of Ameritech's tandem switches, and that it should have compared the capacity of the fiber ring to the capacity of one Ameritech tandem switch.[21] MCI focuses solely on the capacity of its fiber ring, claiming that its current lack of authority to serve every exchange in the Detroit LATA is not relevant. To the contrary, MCI's lack of authority is critical to determining what area its fiber ring serves. MCI did not present evidence that it had the authority to serve every exchange served by even just one of Ameritech's tandem switches. Thus, even if the MPSC had compared the geographic area served by MCI's fiber ring with the area served by just one of Ameritech's tandem switches, MCI's lack of authority to serve every exchange would still lead to the conclusion that the MCI fiber ring does not cover the same geographic area as Ameritech's tandem switch.[22] The MPSC did

---

**19.** A "LATA" is a contiguous geographic area within which a local telephone company may offer telecommunications services, local or long-distance. LATA's were established by Bell operating companies pursuant to a consent decree. 47 U.S.C. § 153(25). Most states have more than one LATA.

**20.** The Court accords substantial deference to the MPSC's factual determination that MCI did not produce sufficient evidence that its switch served an area comparable to Ameritech's switch, as the MPSC's fact findings are reviewed under the arbitrary and capricious standard. *See MCI Telecomm. Corp. v. Illinois Bell Telephone Co.*, No. 97C2225, slip op. at 17 (N.D. Ill. June 22, 1999) (Supplemental Authority, Sept. 2, 1999, Ex. 2) (commission decision that MCI did not provide sufficient evidence that it was entitled to tandem rate was not arbitrary and capricious).

**21.** The language of the FCC regulation is not clear on this point. It refers to the incumbents tandem switch as though there is just one. The regulation states, "where the switch ... serves a geographic area comparable to the area served by the incumbent LEC's tandem switch." 47 C.F.R. § 51.711(a)(3).

**22.** MCI also relies on *US West Comm., Inc. v. Minnesota Public Utilities Comm'n*, 55 F.Supp.2d 968, 987–989 (D.Minn.1999) (JA 72), which broadly held that in determining whether the competitor's switch serves a geographic area comparable to the incumbent's switch, the court must focus on whether the competitor's technology covered the same area as one tandem switch, not the same area as all of the switches in the state. *US West* is inapposite. In *US West*, the competitor's technology served every customer in the LATA, but did not serve every LATA in the

not err, and its decision on this issue is AFFIRMED.

## I. Yellow Pages Listing

MCI contends that Ameritech is required to list MCI's business customers in the Ameritech yellow pages. Ameritech claims that the Act requires only that it provide MCI with "access to directory listings," not that it include MCI's customers in its directories. MCI's interpretation of the Act and the regulations is strained. The Act and the regulations only require that an incumbent local exchange carrier provide *access* to directory listings.

The Telecommunications Act provides that incumbent local exchange carriers provide "nondiscriminatory access to telephone numbers, operator services, directory assistance, and directory listing. . . ." 47 U.S.C. § 251(b)(3).[23] The regulations provide that the local exchange carrier (LEC) must provide access to directory listings as follows:

> A LEC shall provide access to directory listings to competing providers in readily accessible magnetic tape or electronic formats in a timely fashion upon request. A LEC also must permit competing providers to have access to and read the information in the LEC's directory assistance databases.

47 C.F.R. § 51.217(c)(3)(ii).[24] "Directory listing" as used in section 251(b)(3) is synonymous with "subscriber list information" in section 222(f)(3), which means any infor-

mation identifying a carrier's customers, including their names, addresses, phone numbers, and primary advertising classification that a carrier or affiliate has published or caused to be published. Second Report and Order, *Implementation of the Local Competition Provisions of the Telecommunication Act of 1996*, CC Docket No. 96–98, 11 FCC Rcd. 19392 ¶¶ 137 & n. 315 (JA 47); 47 C.F.R. § 51.5 ("directory listings" are defined as those published by an LEC or its affiliate). "Primary advertising classifications" are yellow pages listings.

The Arbitration Panel ruled in favor of MCI on this issue, holding that Ameritech must provide access to directory listings and that such listings included yellow pages. Arbitration Decision at 58 (JA 17). The Panel presumed, without analysis, that "access to directory listings" meant that Ameritech must actually list MCI's business customers in the Ameritech yellow pages.

The MPSC reversed the Panel's decision. The Commission reasoned that the incumbent cannot be required to list a competitor's customers in its yellow pages because in another section of the Act, the incumbent is only required to list a competitor's customers in its white pages. First Approval Order at 6 (JA 20). Section 271 of the Act sets forth certain requirements that an incumbent must meet in order to be permitted to provide long distance services. These requirements are

---

state. Here, in contrast, MCI does not have the authority to serve every customer in the Detroit LATA. Thus, the Commission correctly determined that MCI's fiber ring did not serve a geographic area comparable to Ameritech's tandem switch.

**23.** The regulations define "nondiscriminatory access" as follows:

"Nondiscriminatory access" refers to access to telephone numbers, operator services, directory assistance, and directory listings that is at least equal to the access that the providing local exchange carrier (LEC) itself receives.

Nondiscriminatory access includes, but is not limited to:

(i) Nondiscrimination between and among carriers in the rates, terms, and conditions of the access provided; and

(ii) The ability of the competing provider to obtain access that is at least equal in quality to that of the providing LEC.

47 C.F.R. § 51.217(a)(2). Second Report and Order, *Implementation of the Local Competition Provisions of the Telecommunication Act of 1996*, CC Docket No. 96–98, 11 FCC Rcd. 19392 ¶¶ 101–102 (JA 47).

**24.** The regulations also provide that an incumbent provide access to directory assistance notwithstanding the identity of the customer's service provider or the identity of the provider for the customer whose listing is requested. 47 C.F.R. § 51.217(c)(3)(i).

called the "competitive checklist." The checklist provides that the incumbent must provide "White pages directory listings for customers of the other carrier's telephone exchange service." 47 U.S.C. § 271(c)(2)(B)(viii). The checklist does not state that the incumbent provide "access to" white pages listings; it requires that the incumbent *provide listings.* In contrast, another item on the checklist requires the incumbent to provide "nondiscriminatory access to directory assistance services to allow the other carrier's customers to obtain telephone numbers." *Id.* § 271(c)(2)(B)(vii)(II). Providing "access to" listings is not the same as providing the listing itself. If Congress intended section 251 to require incumbents to provide directory listings to competitors, Congress would have drafted section 251 like section 271(c)(2)(B)(viii), which requires that incumbents provide directory listings. Instead, Congress provided in section 251 that incumbents merely provide access to directory listings. Accordingly, the MPSC decision is AFFIRMED, Ameritech is not required to list MCI's customers in its yellow pages.[25]

## J. Limitation of Liability Provisions

■■■ MCI objects to the limitation of liability provisions set forth in the Agreement, contending that the Commission lacked authority to adopt the provisions at the late stage of the process when they were adopted. The Court finds that the Commission erred; it lacked authority to adopt the limited liability provisions. Thus, these provisions must be stricken from the Interconnection Agreement.[26]

The Agreement's limited liability provisions prohibit the parties from recovering any indirect or consequential damages.

Agreement ¶ 26.5.(JA1). The Agreement also caps liability in tort or contract to the greater of 1) the amount charged for the service not performed or performed improperly; or 2) the amount the negligent or breaching party would have been liable to its customer if the service was provided directly to the customer.

The parties did not identify the issue of limitation of liability as an issue for arbitration, and the initial interconnection agreement was arbitrated and approved without this issue being addressed. The Commission ruled that the interconnection agreement as adopted by the arbitration panel and as modified by the First Approval Order was approved, and the Commission ordered the parties to file a completed agreement. First Approval Order at 8 (JA20). The parties discussed contract language incorporating the Commission's rulings on issues that had been arbitrated. It was at this time that Ameritech first proposed that the agreement include limitation of liability provisions. MCI objected to the inclusion of the provisions, claiming as it does here that the provisions were not arbitrated and that they were not just and reasonable. The issue was not sent to arbitration.

The Commission ordered MCI to accept the limitation of liability provisions. Commission Order, June 5, 1997 (JA 27). The Commission did not address MCI's procedural argument nor did it address MCI's claim that the limited liability provisions were not just or reasonable. Instead, the Commission emphasized that the limitation of liability provisions proposed by Ameritech did not represent Ameritech's original position, but instead were provisions nego-

---

**25.** Ameritech also argues that it does not publish a yellow pages directory. The Ameritech PagesPlus Yellow Pages are published by Ameritech Publishing, Inc. Thus, the MPSC cannot require Ameritech to publish MCI's business customers in a directory. *See, e.g., U.S. West Communications, Inc. v. Garvey*, No. 98–1295 * 19–22 (D.Minn. Mar. 30, 1999) (commission has no authority to regulate publisher

of phone directory; no evidence that LEC controlled its wholly owned subsidiary) (JA 70). The Court does not reach this issue.

**26.** Because the Court makes its findings based on MCI's procedural argument, it is not necessary to reach MCI's additional substantive argument, that the provisions are not "just, reasonable, and nondiscriminatory."

tiated between Ameritech and AT & T. The Commission went on to note:

> The Commission is aware that MCI was not a party to the negotiations that led to the development of that language. However, the Commission notes that MCI's objection fails to articulate any substantive reason for rejection of that language. Because limitation of liability provisions are common in agreements of this nature, the Commission is persuaded that the limitation of liability provision suggested by Ameritech Michigan should be incorporated into its interconnection agreement with MCI.

*Id.* at 6 (JA 27).

The MPSC erred by failing to address MCI's contention that the limited liability provisions must be arbitrated. The Act provides that the parties must set forth the issues to be arbitrated, 47 U.S.C. § 252(b)(2) & (3), and that the state commission must limit its consideration to those issues set forth in the petition and response. 47 U.S.C. § 252(b)(4)(A). Then, the commission has the authority to approve of an interconnection agreement as negotiated and arbitrated by the parties. *Id.* § 252(e)(1) & (2). It is undisputed that the limitation of liability provisions in the Ameritech/MCI Interconnection Agreement were not negotiated nor were they arbitrated; thus, the MPSC did not have the authority to impose those provisions.

Ameritech contends that the MPSC was authorized to incorporate the liability provisions in the Agreement under section 252(e)(3). Section 252(e)(3) provides that state commissions may enforce state law requirements during the approval process. 47 U.S.C. § 252(e)(3). Ameritech claims that the limitation of liability provisions are required by Michigan law, relying on *Rinaldo's Constr. Corp. v. Michigan Bell Tel. Co.*, 454 Mich. 65, 559 N.W.2d 647 (1997).

This argument lacks merit. First, Ameritech did not make this argument to the Commission, and the Commission did not state that it was acting under section 252(e)(3) and was adopting the limited liability provisions because Michigan law required such provisions. Second, *Rinaldo's* did not require interconnection agreements to contain limited liability provisions. In that case, the Michigan Supreme Court held that the MPSC had primary jurisdiction to hear customers' claims that are covered by liability limitations in Ameritech's retail tariffs. The court explained that the Commission should have primary jurisdiction in order to establish uniform limitations of liability which were "essential to prevent the telephone company from being exposed to unanticipated liabilities that [would] hinder its ability to provide affordable phone service." 454 Mich. at 76, 559 N.W.2d at 655. While the court noted that limitation of liability provisions in retail tariffs were "essential" it did not establish that such provisions were necessary in an interconnection agreement as a matter of law.

In addition to arguing that section 252(e)(3) applies, Ameritech also contends that the state commission had authority to adopt the limited liability provisions because commissions have the authority to determine subsidiary issues in order to ensure that the proposed interconnection agreement is a working document that complies with the Act. *TCG Milwaukee, Inc. v. Public Serv. Comm'n of Wis.*, 980 F.Supp. 992 (W.D.Wis.1997); *accord MCI Telecomm. Corp. v. Pacific Bell*, No. C 97–0670 SI, 1998 U.S. Dist. LEXIS 17556, at *78 (N.D.Cal. Sept. 29, 1998) (JA 57). In *TCG*, the court explained that although the state commission is limited to deciding issues delineated by the parties, the Act requires the commission to resolve fundamental issues like pricing in order to make an interconnection agreement a working document. *Id.* at 1000. Thus, the court held that the commission had the authority to address the issue of whether the competitor's switch should be treated as an end office switch or a tandem switch and to set the reciprocal pricing accordingly.

*TCG* does not apply. In *TCG*, the provisions at issue were raised and adopted in the arbitration process. Here, the parties did not raise the issue of limitation of liability during the arbitration process and the provisions were not adopted until after the Interconnection Agreement was first approved. Moreover, the Agreement was operable without any limitation of liability provisions. Michigan common law governs liability issues in the absence of contractual provisions which address the matter.

Ameritech also argues that under section 252(e)(2), the Commission had to impose the limited liability provisions because, if it did not do so, it would be required to reject the interconnection agreement. Section 252(e)(2) provides that a commission must reject an agreement if it does not comply with the Act's pricing standards, set forth in section 252(d), or if it does not comply with section 251, including the requirement that the agreement be non-discriminatory. 47 U.S.C. § 252(e)(2)(B). Ameritech claims that the prices under the Agreement were based on the inclusion of the limited liability provisions.[27]

Ameritech's argument is misdirected. Section 252(e)(2) requires a commission to reject a proposed interconnection agreement that does not conform with the Act. It does not authorize a commission to add provisions that were not negotiated and arbitrated in order to "fix" a nonconforming agreement. Further, Ameritech's claim that its prices presume limited liability is disingenuous. The MPSC in fact approved of the Agreement without the inclusion of the limited liability provisions. The MPSC consistently adopted MCI's proposed prices, see Arbitration Decision at 9–18 (JA 17), and MCI's proposed prices were not based on the inclusion of limited liability provisions. In fact, the FCC's pricing regulations govern the issue of prices. Prices must be based on forward-looking costs. 47 C.F.R. § 51.505(b).

The regulations do not require limited liability provisions.

Ameritech also contends that the Agreement would be discriminatory without the limited liability provisions because its agreements with other competitors contain such provisions. The terms of other interconnection agreements are not part of the record here and are not relevant to a determination of whether this Agreement complies with the Act. Further, the Act does not require that all interconnection agreements be identical. *MCI Telecomm. Corp. v. Illinois Bell Telephone Co.*, No. 97C2225, slip op. at 30 (N.D. Ill. June 22, 1999) (Supplemental Authority, Sept. 2, 1999, Ex. 2). Moreover, Ameritech does not have standing to raise the discrimination claims which may be asserted by other competitors. *MCI Telecomm. Corp. v. Pacific Bell*, No. C97–0670 SI, 1998 U.S. Dist. Lexis 17556, at *105 (JA 57).

In sum, the MPSC lacked the authority to add the limited liability provisions to the Interconnection Agreement. The Court hereby REVERSES the Commission's order requiring that the limited liability provisions be included in the Agreement, and REMANDS to the Commission for reformation of the Interconnection Agreement. The Agreement shall be reformed by striking the limited liability provisions.

## IV. Conclusion

For the foregoing reasons, the decisions of the Michigan Public Service Commission is AFFIRMED in part and REVERSED in part as follows:

1. The MPSC's decision to incorporate MCI's proposed benchmarks and penalties in the Interconnection Agreement is AFFIRMED.

2. The MPSC's adoption of MCI's proposed time frames for cutover of unbundled loops is AFFIRMED.

---

**27.** Ameritech made this same argument to the Commission; the Commission did not address it.

3. The MPSC's decision to adopt MCI's propose BFR time frames is AFFIRMED.

4. The MPSC's interpretation of the term "rights-of-way" is consistent with the Act and the regulations and is AFFIRMED.

5. The issue of whether Ameritech must provide dark fiber to MCI on an unbundled basis is hereby REMANDED to the MPSC for decision in light of the new FCC regulations.

6. With regard to loop distribution, where it is not feasible to unbundle loop distribution, the decision of the MPSC is AFFIRMED. The issue of whether Ameritech is required to provide to MCI unbundled access to loop distribution where it is feasible to do so is REMANDED to the MPSC for decision in light of the new FCC regulations.

7. The issue of the price of local switching in conjunction with common transport is hereby REMANDED to the Commission. The Commission shall reform the Interconnection Agreement to set local switching prices (in conjunction with common transport) that are based on forward-looking long-run incremental costs as required by the Act and the federal regulations.

8. The MPSC's decision that MCI should be compensated at the end office rate, and not the tandem interconnection rate, is AFFIRMED.

9. The MPSC's decision that Ameritech is not required to list MCI's customers in its yellow pages is AFFIRMED.

10. The MPSC's order requiring that the limited liability provisions be included in the Agreement is REVERSED, and the issue is REMANDED to the Commission for reformation of the Interconnection Agreement. The Agreement shall be reformed by striking the limited liability provisions.

SO ORDERED.

1. The Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996) is

OPINION AND ORDER 1) DENYING AMERITECH'S MOTION TO AMEND THE JUDGMENT OR, IN THE ALTERNATIVE, FOR RECONSIDERATION OF ONE ASPECT OF THE COURT'S SEPTEMBER 29, 1999 OPINION AND ORDER AND 2) GRANTING MCI'S MOTION TO ALTER OR AMEND THE COURT'S SEPTEMBER 29, 1999 OPINION AND ORDER

■ This case came before the Court on two motions for reconsideration: 1) Ameritech's motion to amend the judgment or, in the alternative, for reconsideration of one aspect of the Court's September 29, 1999 Opinion and Order and 2) MCI's motion to alter or amend the Court's September 29, 1999 Opinion and Order. The Court treats both motions as motions for reconsideration. For the reasons set forth below, Ameritech's motion for reconsideration is DENIED, and MCI's motion for reconsideration is GRANTED.

## I. Facts

MCI Telecommunications Corporation and MCImetro Access Transmission Services, Inc. (collectively "MCI") and Michigan Bell Telephone Company d/b/a Ameritech Michigan, Inc. ("Ameritech") appealed Michigan Public Service Commission ("MPSC") Case No. U–11168, each claiming that certain terms of their Interconnection Agreement, as arbitrated by the MPSC, violated the Telecommunications Act of 1996.[1] MCI alleged that the Interconnection Agreement violated the Act by improperly limiting Ameritech's liability for misconduct (MCI's Amended Complaint, Count II). MCI also alleged that the Interconnection Agreement failed to required Ameritech to provide MCI with access to Ameritech's yellow pages (MCI's Amended Complaint, Count IV). On September 29, 1999, this Court issued

codified in scattered sections of the United States Code, Title 47.

an Opinion and Order finding that the Commission erred by adopting the limited liability provisions. The Court reversed the Commission's order requiring that the limited liability provisions be included in the Agreement and remanded for reformation of the Agreement to delete such provisions. In the same Opinion, the Court affirmed the Commission's decision that Ameritech is not required to list MCI's customers in its yellow pages. Pursuant to Federal Rule of Civil Procedure 59(e) and Local Rule 7.1, Ameritech filed a motion for reconsideration of the Court's decision regarding the limited liability provisions, and MCI filed a motion for reconsideration of the Court's decision regarding the yellow pages listing.[2]

## II. Standard of Review

Pursuant to Rule 7.1(g) of the Local Rules for the Eastern District of Michigan, a motion for reconsideration may be filed within ten days after the order to which it objects is issued. It should be granted if the movant demonstrates that the Court and the parties have been misled by a palpable defect and that a different disposition of the case must result from a correction of such palpable defect. A motion that merely presents the same issues already ruled upon by the Court shall not be granted.[3]

In reviewing the MPSC decisions at issue here, the Court reviews questions of law *de novo*, and issues of fact under an arbitrary and capricious standard. *U.S.*

*West Communications, Inc. v. Hix*, 986 F.Supp. 13, 19 (D.Colo.1997).

## III. Analysis

### A. Limitation of Liability Provisions

In the September 29, 1999 Opinion and Order, the Court held that the Commission lacked authority to adopt the limited liability provisions[4] at the late stage of the process when they were adopted. The parties did not raise the issue of limitation of liability during the arbitration process, and the provisions were not adopted until after the Interconnection Agreement was first approved. The Commission ruled that the interconnection agreement as adopted by the arbitration panel and as modified by the First Approval Order was approved, and the Commission ordered the parties to file a completed agreement. First Approval Order at 8 (JA20). The parties discussed contract language incorporating the Commission's rulings on issues that had been arbitrated. It was at this time that Ameritech first proposed that the agreement include limitation of liability provisions. MCI objected to the inclusion of the provisions, claiming as it does here that the provisions were not arbitrated and that they were not just and reasonable. The issue was not sent to arbitration.

The Commission then ordered MCI to accept the limitation of liability provisions. Commission Order, June 5, 1997 (JA 27). The Commission did not address MCI's procedural argument nor did it address

---

**2.** While Ameritech and MCI titled their motions "motion to alter or amend the judgment," the Court has since clarified that the September 29, 1999 Opinion and Order does not constitute a final judgment. Order Granting Ameritech's Motion for Clarification, filed October 25, 1999. Thus, the Court treats the motions as motions for reconsideration.

**3.** Similarly, a motion to alter or amend a judgment under Fed.R.Civ.P. 59 may be granted: 1) due to an intervening change in controlling law; 2) because evidence previously unavailable has become available; or 3) to correct a clear error or prevent manifest

injustice. *Nagle Indus., Inc. v. Ford Motor Co.*, 175 F.R.D. 251, 254 (E.D.Mich.1997), *aff'd*, 194 F.3d 1339, 1999 WL 447080 (Fed. Cir.1999).

**4.** The Agreement's limited liability provisions prohibit the parties from recovering any indirect or consequential damages. Agreement ¶ 26.5(JA1). The Agreement also caps liability in tort or contract to the greater of 1) the amount charged for the service not performed or performed improperly; or 2) the amount the negligent or breaching party would have been liable to its customer if the service was provided directly to the customer.

MCI's claim that the limited liability provisions were not just or reasonable. Instead, the Commission emphasized that the limitation of liability provisions proposed by Ameritech did not represent Ameritech's original position, but instead were provisions negotiated between Ameritech and AT & T. The Commission went on to explain that it adopted the provisions because they were "common:"

> The Commission is aware that MCI was not a party to the negotiations that led to the development of that language. However, the Commission notes that MCI's objection fails to articulate any substantive reason for rejection of that language. Because limitation of liability provisions are common in agreements of this nature, the Commission is persuaded that the limitation of liability provision suggested by Ameritech Michigan should be incorporated into its interconnection agreement with MCI.

*Id.* at 6 (JA 27).

The Act provides that the parties must set forth the issues to be arbitrated, 47 U.S.C. § 252(b)(2) & (3), and that the state commission must limit its consideration to those issues set forth in the petition and response. 47 U.S.C. § 252(b)(4)(A). Then, the commission has the authority to approve of an interconnection agreement as negotiated and arbitrated by the parties. *Id.* § 252(e)(1) & (2). It is undisputed that the limitation of liability provisions in the Ameritech/MCI Interconnection Agreement were not negotiated nor were they arbitrated; thus, the MPSC did not have the authority to impose those provisions.

Ameritech contends in its motion for reconsideration that the MPSC was authorized to incorporate the liability provisions in the Agreement under section 252(e)(3). Section 252(e)(3) provides, "[N]othing in this section [252] shall prohibit a State commission from *establishing* or enforcing other requirements of State law in its review of an agreement." 47 U.S.C. § 252(e)(3) (emphasis added). Ameritech claims that the limitation of liability provi-

sions were required by Michigan law, relying on *Rinaldo's Constr. Corp. v. Michigan Bell Tel. Co.*, 454 Mich. 65, 559 N.W.2d 647 (1997), and if not already required, were newly "established" by the MPSC as state law requirements.

Ameritech merely reiterates an argument previously rejected by the Court as meritless. Ameritech did not make the section 252(e)(3) argument to the Commission, and the Commission did not address MCI's contention that it lacked authority to adopt the limited liability provisions at that late stage of the proceedings. Further, the Commission did not indicate in any way that it was acting under section 252(e)(3) to enforce or to create and establish a state law provision. The Commission did not make any reference to state law whatsoever. Instead, it merely indicated that "limitation of liability provisions are common in agreements of this nature." Commission Order, June 5, 1997 *6 (JA 27).

Moreover, Michigan law does not require interconnection agreements to contain limited liability provisions. In *Rinaldo's*, the Michigan Supreme Court held that the MPSC had primary jurisdiction to hear customers' claims that are covered by liability limitations in Ameritech's retail tariffs. The court explained that the Commission should have primary jurisdiction in order to establish uniform limitations of liability which were "essential to prevent the telephone company from being exposed to unanticipated liabilities that [would] hinder its ability to provide affordable phone service." 454 Mich. at 76, 559 N.W.2d at 655. While the Michigan Supreme Court in *Rinaldo's* noted that limitation of liability provisions in retail tariffs were "essential" it did not establish that such provisions were necessary in the context of an interconnection agreement.

Ameritech fails to demonstrate that the Court and the parties were misled by a palpable defect and that a different disposition of the case must result. Accordingly, Ameritech's motion for reconsideration

of the Court's September 29, 1999 Opinion and Order is denied.

## B. Yellow Pages Listing

 In the September 29, 1999 Opinion and Order, the Court affirmed the decision of the MPSC, holding that Ameritech is not required to list MCI's customers in its yellow pages. MCI moves to reconsider, based on the FCC's ruling clarifying that the law does in fact require incumbents who provide directory listings to their own customers to provide such listings to their competitors' customers.

In the September 29, 1999 Opinion, the Court held that the Act and regulations require only that incumbents provide competitors with "access to directory listings," not that they include competitors' customers in their directories. The Court explained as follows:

> The Telecommunications Act provides that incumbent local exchange carriers provide "nondiscriminatory access to telephone numbers, operator services, directory assistance, and directory listing . . . ." 47 U.S.C. § 251(b)(3). The regulations provide that the local exchange carrier (LEC) must provide access to directory listings as follows:
>
> A LEC shall provide access to directory listings to competing providers in readily accessible magnetic tape or electronic formats in a timely fashion upon request. A LEC also must permit competing providers to have access to and read the information in the LEC's directory assistance databases.
>
> 47 C.F.R. § 51.217(c)(3)(ii). "Directory listing" as used in section 251(b)(3) is synonymous with "subscriber list information" in section 222(f)(3), which means any information identifying a carrier's customers, including their names, addresses, phone numbers, and primary advertising classification that a carrier or affiliate has published or caused to be published. Second Report and Order, *Implementation of the Local Competition Provisions of the Telecommunication Act of 1996*, CC Docket No. 96–98, 11 FCC Rcd. 19392 ¶¶ 137 & n. 315 (JA

47); 47 C.F.R. § 51.5 ("directory listings" are defined as those published by an LEC or its affiliate). "Primary advertising classifications" are yellow pages listings.

The Arbitration Panel ruled in favor of MCI on this issue, holding that Ameritech must provide access to directory listings and that such listings included yellow pages. Arbitration Decision at 58 (JA 17). The Panel presumed, without analysis, that "access to directory listings" meant that Ameritech must actually list MCI's business customers in the Ameritech yellow pages.

The MPSC reversed the Panel's decision. The Commission reasoned that the incumbent cannot be required to list a competitor's customers in its yellow pages because in another section of the Act, the incumbent is only required to list a competitor's customers in its white pages. First Approval Order at 6 (JA 20). Section 271 of the Act sets forth certain requirements that an incumbent must meet in order to be permitted to provide long distance services. These requirements are called the "competitive checklist." The checklist provides that the incumbent must provide "White pages directory listings for customers of the other carrier's telephone exchange service." 47 U.S.C. § 271(c)(2)(B)(viii). The checklist does not state that the incumbent provide "access to" white pages listings; it requires that the incumbent *provide listings.* In contrast, another item on the checklist requires the incumbent to provide "nondiscriminatory access to directory assistance services to allow the other carrier's customers to obtain telephone numbers." *Id.* § 271(c)(2)(B)(vii)(II). Providing "access to" listings is not the same as providing the listing itself. If Congress intended section 251 to require incumbents to provide directory listings to competitors, Congress would have drafted section 251 like section 271(c)(2)(B)(viii), which requires that incumbents provide directory listings. Instead, Congress provided in section 251

that incumbents merely provide access to directory listings. Accordingly, the MPSC decision is AFFIRMED, Ameritech is not required to list MCI's customers in its yellow pages.

September 29, 1999 Opinion and Order pp. 43–45 (footnotes omitted).

At the time it issued its Opinion, the Court was not aware that the FCC had just clarified the meaning of "directory listing" in section 251(b)(3). *See In re Implementation of the Telecommunications Act of 1996,* Third Report and Order in CC Docket No. 96–115, Second Order on Reconsideration of the Second Report and Order in CC Docket No. 96–98, and Notice of Proposed Rulemaking in CC Docket No. 99–273 (rel. Sept. 9, 1999) (MCI's Motion to Alter or Amend, Exhibit 1) [hereinafter cited as the "Directories Order"].[5] The FCC explained that the reference to "directory listing" in section 251(b)(3) refers to the act of listing a customer in a directory. The FCC's Directories Order provides:

> MFS [now MCI WorldCom, Inc.] states that "directory listing" refers to the act of placing a customer's listing information in a published directory compilation, such as in white pages or an Internet directory. *MFS asserts, therefore, that nondiscriminatory access to directory listing should mean that "a carrier publishing a telephone directory has a duty to incorporate a listing supplied by its competitor with the same level of accuracy, in the same manner, and in the same time frame that it would list its own customer's information."* It states that access to listings suggests a duty to provide a carrier with access to a compilation of information in a directory, while access to directory listing involves listing a particular subscriber in a directory.
>
> . . . .
>
> *We agree* with those petitioners who contend that our rules should be modi-

fied to recognize the difference between directory "listing" and directory "listings," and that our rules should recognize that these terms are distinct from directory assistance under the 1996 Act. *We conclude that the section 251(b)(3) requirement of non-discriminatory access to directory listing is most accurately reflected by the suggestion of MFS and Bell Atlantic that directory listing be defined as a verb that refers to the act of placing a customer's listing information in a directory assistance database or in a directory compilation for external use (such as a white pages).*

Directories Order ¶¶ 158 & 160 (emphasis added).

The Directories Order is now binding on this Court. "Unless and until an FCC regulation is stayed or overturned by a court of competent jurisdiction, the FCC regulations have the force of law and are binding upon state [commissions] and federal district courts. . . . [R]eview of FCC rulings is committed to the exclusive jurisdiction of the United States Courts of Appeal; as such, this Court may not inquire into the validity of an FCC regulation." *AT&T Communications of Calif., Inc. v. Pacific Bell,* No. C97–0080 SI, 1998 WL 246652 at *2 (N.D.Cal. May 11, 1998) (citations omitted) (MCI's Motion to Alter or Amend, Exhibit 4).

In light of the Directories Order, MCI requests that the Court alter or amend its Opinion and Order, reverse the MPSC's ruling, and direct the MPSC to require Ameritech to list MCI's customers in its yellow pages directories on a nondiscriminatory basis. Ameritech contends that the Court should not amend its Order and reverse the MPSC because those rulings were correct when decided, under the law as it then stood. Further, Ameritech argues, the Interconnection Agreement provides that in the event of a change in the law, the parties may renegotiate and amend their Agreement.[6] Ameritech in-

---

**5.** MCI filed a Notice of Supplemental Authority citing the Directories Order on September

29, 1999, the same day that the Court issued its Opinion and Order.

**6.** Section 29.3 of the Interconnection Agree-

sists that renegotiation is the proper procedure in this case.

MCI cannot be compelled to renegotiate this issue. First, the Directories Order merely clarified existing law. "A rule clarifying an unsettled or confusing area of the law does not change the law, but restates what the law according to the agency is and has always been...." *Orr v. Hawk,* 156 F.3d 651, 654 (6th Cir.1998) (quotations omitted). The FCC has clarified what the law was, as it stood at the time the MPSC ruled. Accordingly, the MPSC's yellow pages ruling was in error, as was this Court's September 29 yellow pages ruling. The FCC ruling does not constitute a "change in the law" covered by the Interconnection Agreement's renegotiation provision.

Second, the renegotiation provision is not a mandatory exhaustion requirement. It is optional, as it uses the word "may." Further, it does not deprive the parties of their right to bring an action under the Telecommunications Act nor does it deprive the Court of the power to hear such an action. "[T]he Act provides that "any party aggrieved" by a state commission's determination may bring a federal court action to determine whether an agreement contradicts the Act. The agreement's dispute resolution clause does not purport to deprive the court of this power, or purport to be a mandatory first step." *MCI Telecomm. Corp. v. U.S. West Comm., Inc.,* No C97–1508R, 1998 U.S. Dist. Lexis 21585 at *8 (W.D.Wash. July 21, 1998) (MCI's Reply, Exhibit 2). *See also Wisconsin Bell, Inc. v. Public Serv. Comm'n of Wis.,* Nos. 97–C–566–C, 98–C–11–C, 98–C–153–C, & 98–C–366–C, Tr. at 36–37 (W.D. Wis. June 24, 1999) (MCI's Reply, Exhibit 1) (renegotiation provision is optional vehicle for modifying contract due to change in law, not a mandatory procedure).

Ameritech further argues that it cannot be required to publish MCI's customers in its yellow pages because Ameritech does not publish a yellow pages directory. The Ameritech PagesPlus Yellow Pages, which lists Ameritech's business customers, are published by a separate company called Ameritech Publishing, Inc., also known as Ameritech Advertising Services. Ameritech points out that paragraph 158 of the Directories Order provides that "a LEC publishing a telephone directory has a duty to incorporate a listing supplied by its competitor." Further, Ameritech relies on *U.S. West Communications, Inc. v. Garvey,* No. 98–1295 * 19–22 (D.Minn. Mar. 30, 1999) (JA 70), which held that the state commission had no authority to regulate the publisher of a phone directory, which was a wholly owned subsidiary of the ILEC, where there was no evidence that ILEC controlled the publisher. Ameritech reasons that because it does not publish a yellow pages directory, it has no duty to publish MCI's listings in such a directory.

This argument is specious. Paragraph 158 of the Directories Order simply explains the competing LEC's argument that the term "directory listing" should be defined as a verb, the act of placing customer's listing in a directory. The FCC's ruling is found in paragraph 160, which provides, "We conclude that the section 251(b)(3) requirement of non-discriminatory access to directory listing is most accurately reflected by the suggestion of MFS and Bell Atlantic that directory listing be defined as a verb that refers to the act of placing a customer's listing information in

ment (JA 1) provides:

> In the event of any amendment to the Act, or any final and nonappealable legislative, regulatory, judicial order, rule or regulation or other legal action that revises or reverses the Act, the FCC's First Report and Order in CC Docket Nos. 96–98 and 95–185 or any applicable Commission order or arbitration award purporting to apply the provi-

sion of the Act, either Party *may* by providing written notice to the other Party require that the affected provisions be renegotiated in good faith and this Agreement be amended accordingly to reflect the pricing, terms and conditions of each such Amendment to the Act relating to any of the provisions of this Agreement.....

(Emphasis added).

a directory assistance database or in a directory compilation for external use (such as a white pages)." The FCC did not indicate that "the act of placing a customer's listing" must be performed directly by the incumbent carrier itself. To the contrary, the regulations define "directory listings" more broadly as any information "that *the telecommunications carrier or an affiliate* has published, *caused to be published,* or accepted for publication in any directory format." 47 C.F.R. § 51.5. Thus, the duty to publish competitors' business customers in a yellow pages directory on a nondiscriminatory basis extends to incumbent carriers who have caused their own customers listings to be published in a yellow pages directory.

Ameritech argues that Ameritech Publishing, Inc., a/k/a Ameritech Advertising Services, is not owned or controlled by Ameritech and thus is not an affiliate governed by the Telecommunications Act and its regulations. Ameritech asserts that Ameritech Publishing is an independent company which provides directory listings by contract to Ameritech and to other carriers.

There is evidence to the contrary. Ameritech Services division vice president Gregory Dunny repeatedly referred to Ameritech Publishing as Ameritech's directory "affiliate." Testimony of Dunny, Docket No. U–11168, Oct. 17, 1996 at 75–77 (JA 12). Furthermore, Ameritech exercises some control over Ameritech Publishing, as the Interconnection Agreement provides that "Ameritech shall cause the Publisher to include Primary Customer Listings of MCIm's Customers in its White Pages Directories...." Agreement ¶ 15.1 (JA 1). " 'Publisher' means Ameritech White Pages Directories publisher," *Id.* Schedule 1.2–10, which currently is Ameritech Publishing. Thus, Ameritech agreed to cause Ameritech Publishing to publish both its own customers and MCI's customers in the white pages directory.

Moreover, the issue of whether Ameritech Publishing is an affiliate of Ameritech is not relevant because the regulation is drafted more broadly. "Directory listings" include those that an incumbent carrier has "caused to be published." 47 C.F.R. § 51.5. Ameritech causes its own customers to be published in the Ameritech PagesPlus Yellow Pages. Therefore, Ameritech has the duty to provide nondiscriminatory access to such yellow pages publication to MCI's customers.

Due to the FCC's September 9, 1999 clarification of the law, the Court finds that its September 29, 1999 Opinion and Order with respect to the issue of yellow pages publication was in error. Accordingly, MCI's motion for reconsideration of the Court's September 29, 1999 Opinion and Order is granted. The September 29, 1999 Opinion and Order is amended to provide as follows: The MPSC's decision that Ameritech is not required to list MCI's customers in its yellow pages is reversed and the issue is remanded to the Commission for reformation of the Interconnection Agreement. The Agreement shall be reformed by including provisions which require Ameritech to provide nondiscriminatory access to yellow pages directory listing to MCI's business customers.

## IV. Conclusion

For the foregoing reasons, the Court hereby orders as follows:

1. Ameritech's motion to amend the judgment or, in the alternative, for reconsideration of one aspect of the Court's September 29, 1999 Opinion and Order is DENIED. As the Court explained in its September 29 Opinion, the MPSC's order requiring that the limited liability provisions be included in the Agreement is REVERSED, and the issue is REMANDED to the Commission for reformation of the Interconnection Agreement. The Agreement shall be reformed by striking the limited liability provisions.

2. MCI's motion to alter or amend the Court's September 29, 1999 Opinion and Order is GRANTED. The September 29, 1999 Opinion and Order is AMENDED to

provide as follows: The MPSC's decision that Ameritech is not required to list MCI's customers in its yellow pages is REVERSED. The issue is REMANDED to the Commission for reformation of the Interconnection Agreement. The Agreement shall be reformed by including provisions which require Ameritech to provide nondiscriminatory access to yellow pages directory listing to MCI's business customers.

SO ORDERED.